**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Francis F. PAUL, Defendant–Appellant.**

No. 01–1284.

United States Court of Appeals,
Sixth Circuit.

Jan. 23, 2003.

Before BOGGS and COLE, Circuit Judges; and BATTANI, District Judge.*

PER CURIAM.

Dr. Francis F. Paul was named in a 47–count indictment issued in March 2000: Count 1 charged Dr. Paul with attempting to evade and defeat the payment of assessed personal income taxes for calendar years 1987 through 1991; Count 2 charged Dr. Paul with violating 26 U.S.C. § 7206(1) by subscribing his signature and knowingly submitting a false Offer–in–Compromise (and its accompanying schedules and attachments) to the Internal Revenue Service (IRS). Count 3 charged Dr. Paul with signing and submitting a false 1993 individual income tax return, in violation of 26 U.S.C. § 7206(1); Count 4 charged Dr.

---

* The Honorable Marianne O. Battani, United States District Judge for the Eastern District of Michigan, sitting by designation.

Paul with bank fraud, in violation of 18 U.S.C. § 1344; and Counts 5–47 charged Dr. Paul with committing mail fraud in furtherance of his alleged scheme to defraud a federal bank, set forth in Count 4. Dr. Paul went to trial in October 2000, and was convicted by the jury on all counts, except for Count 11, which was dismissed by the court during the trial on a motion from the government. Dr. Paul now appeals his conviction on Counts 4–10 and 12–47, on a number of different grounds.

Dr. Paul claims the trial judge committed plain error at three points during the trial and thus his conviction should be vacated and a new trial held. First, Dr. Paul claims the judge erred by making improper and misleading introductory comments during the jury selection process. Second, Dr. Paul claims the judge erred by dismissing certain potential jurors during the voir dire process without sufficiently probing their potential for impartiality. Third, Dr. Paul claims the judge erred by engaging in *ex parte* communications with the jurors.

Next, Dr. Paul appeals the district court's denial of his motion for acquittal, in which he claimed that there was insufficient evidence for his conviction on the bank fraud charge, and additionally claims that the trial judge abused his discretion by admitting evidence that was unrelated to the crimes for which Dr. Paul was charged. Finally, Dr. Paul claims that the district court abused its discretion by denying Dr. Paul's motion for a new trial on the basis of allegedly improper and misleading jury instructions and committed clear error in its calculation of the tax loss sustained by the government as a result of Dr. Paul's actions.

On February 16, 2000, the district court sentenced Dr. Paul to fifty-four months on Counts 1, 4–10 and 12–47, to run concurrent with a term of imprisonment of thirty-six months on Counts 2 and 3, with post-confinement conditions imposed on Dr. Paul's supervised release, requiring that Dr. Paul refrain from using alcohol and perform 300 hours of community service in a non-medical field. Apart from the appeals that Dr. Paul has brought with regard to his conviction, he challenges his sentencing, contending that the district court committed clear error in applying separate two-level enhancements for sophisticated concealment of his offenses, his leadership role in the crimes, and for obstructing justice. In addition, Dr. Paul contends that the district court committed plain error in setting the terms of his post-confinement supervised release. We affirm on all points.

I

Francis F. Paul was a self-employed neurosurgeon in the Muskegon, Michigan area. During the late 1980's and into the early 1990's, Dr. Paul's practice steadily declined and he began to accumulate large debts. Beginning in 1988, Dr. Paul failed to file his federal income tax returns on time. When he was directly contacted by the Internal Revenue Service (IRS) several years later, Dr. Paul filed the delinquent returns, but did not pay the taxes that were due with the returns filed. In addition, Dr. Paul collected, but did not pay over to the IRS, his employees' income withholdings.

Dr. Paul owned a house in North Muskegon. As a result of his falling behind on the monthly mortgage payments, the bank started foreclosure on the property. During a six-month mortgage redemption period, Dr. Paul suggested to a friend, Edward Snider, that he buy the home and rent it back to Dr. Paul. Snider's testimony revealed that he understood Dr. Paul needed to put the property into someone else's name in order to protect it from creditors.

Snider testified that he decided to go forward with the purchase of the house in order to help Dr. Paul.

In September 1991, Dr. Paul's attorney prepared a Purchase and Sale Agreement, in which Snider was to purchase the property from Dr. Paul for $300,000, with $60,000 to be paid by Snider to Dr. Paul as a down payment. Subsequently, on October 5, 1991, Dr. Paul and Snider executed an agreement (the Rental Agreement) in which Dr. Paul agreed to rent the house from Snider after closing on the sale of the property for the amount of Snider's mortgage payment. The Rental Agreement was for a term of seven years, included an option for Dr. Paul to buy the property at any time during the term of the agreement for a sum equal to the outstanding mortgage balance or a sum greater than that at Paul's discretion, required Dr. Paul to pay the real estate taxes and unspecified insurance premiums on the property, and provided for the establishment of an interest-bearing account in Snider's name, which would hold a sum equal to three monthly mortgage payments to be deposited by Dr. Paul, with the interest on the money to be divided equally between Dr. Paul and Snider.

After being denied a mortgage at Old Kent Bank, Snider approached a non-federally-insured Michigan mortgage broker, the Mortgage House, and submitted a loan application in October 1991. The mortgage broker obtained a mortgage from St. Paul Federal Bank, a federally insured bank, on the basis of a loan application submitted to the Mortgage House by Snider in which he misrepresented his income, assets, and profession, and also incorrectly stated that he had given Dr. Paul $60,000 as a down payment on the property. Additionally, Snider submitted a phony bill of sale for a diamond to be used as collateral, a phony gift letter to explain

where the $60,000 down payment had come from, and false tax returns. Snider alleges that he did all of this with Dr. Paul's knowledge and help.

St. Paul Federal Bank (the Federal Bank) sent a loan commitment letter to the Mortgage House and subsequently the closing on the property took place. Nevertheless, neither Dr. Paul nor Snider disclosed the existence of the Rental Agreement to either the Mortgage House or the Federal Bank. Over the course of the next few years, Dr. Paul sent Snider checks to cover the mortgage payments and Snider used those funds to pay the mortgage. These checks are the basis of the mailings charged in Counts 5–47, mail fraud. Because of late payments, Snider twice filed suit against Dr. Paul for back rent in Michigan state court.

In February 1992, Dr. Paul's practice in Muskegon had declined to such an extent that he was forced to shut it down and Dr. Paul began a new practice in Idaho Falls, Idaho, affiliated with the Eastern Idaho Regional Medical Center (EIRMC). EIRMC provided Dr. Paul with several loans in order to help start his practice and defray moving costs, so that by the end of 1993, Dr. Paul owed the company $235,000 plus interest, which increased to more than $363,000 by early 1994. Dr. Paul paid his employees in this new office in cash and did not apply for a new Employer Identification Number for the practice. In addition, Dr. Paul did not open up a checking account in the practice's name and utilized five different bank accounts to deposit checks from patients for services.

By 1994, Dr. Paul was assessed approximately $311,000 in unpaid taxes, penalties, and interest, approximately $138,000 of which was actual tax. In May 1994, the IRS decided to accept an Offer–in–Compromise filed by Dr. Paul. which would forgive his tax debt of $311,431.55 for the

reduced amount of $50,000. This compromise was reached on the basis of financial statements provided to the IRS by Dr. Paul with regard to his current assets and income, which caused the IRS to make a determination that the residual money owed would very likely remain uncollectible. However, Dr. Paul did not disclose to the IRS that he had a new practice in Idaho, an ongoing interest in a the North Muskegan residence, five bank accounts in Idaho, Nevada, and Wyoming, ownership of an antique Packard automobile, and a new home in Idaho Falls, purchased for $250,000 on an unrecorded land contract. In fact, when dealing with the IRS, Dr. Paul used a false Nevada address, a Nevada driver's license, and Nevada automobile license plates.

In July 1993, Dr. Paul and William Sewell, the husband of Dr. Paul's Idaho Falls office manager, formed an entity known as the Idaho Brain Tumor Center (IBTC), which was to develop and utilize a new medical technology called "boron neutron capture therapy." In July 1994, EIRMC made another loan to Dr. Paul, this time in the amount of $297,000. Dr. Paul gave the proceeds of that loan to the IBTC. In total, Dr. Paul invested approximately $500,000 into IBTC, which sustained huge losses over the course of its existence. EIRMC filed a claim against Dr. Paul in federal court for a sum in excess of $868,152, which included the various loans made to him. In 1999, Dr. Paul managed to refinance the Michigan home through another bank mortgage, paid off the St. Paul Federal Bank mortgage and thereby removed Snider as the owner of record. Shortly thereafter, Dr. Paul sold the house at a substantial profit. In 1997, the IRS began a criminal investigation of Dr. Paul, which eventually led to his arrest and indictment for the charges in this case.

## II

### 1. Claims of Plain Error During the Trial

Dr. Paul now appeals three events during the course of his trial to which his lawyer did not make a timely objection. We restrict our review of these claims, therefore, to correcting "plain errors or defects affecting substantial rights" under Fed. R. Crim P. 52(b). *See United States v. Dedhia*, 134 F.3d 802, 808–09 (6th Cir. 1998). Before this court can correct an error not raised at trial, there must be 1) error, 2) that is plain, and 3) that affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Fed.R.Crim.P. 52(b). If those three factors are met, then this court may exercise its discretion to notice a forfeited error if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732, 113 S.Ct. 1770.

### Introductory Comments Made by the Trial Judge

Dr. Paul contends that the trial judge committed plain error by suggesting to the jurors that they were to apply their own local values and local sense of justice when evaluating issues at trial, that the comments tainted the jurors' perception of their role in the proceeding, and that this court should, therefore, reverse Dr. Paul's conviction and order a new trial. In part, the judge stated:

This is your community. And I can't speak more strongly for the fact that the values that are cherished and are a part, indigenous to West Michigan, you bring to this courtroom, and that's okay. And you will use those as you evaluate a matter such as this.

. . .

You represent [a] statistical cross section [of your district]. That's very im-

portant because a jury that sits and deliberates on justice and a just result has historically come from the district where the event is alleged to have occurred and is one in which it is said in the earliest English roots that it's a peer group of the community sitting in judgment on itself. That is, you bring to this courthouse, whether consciously or unconsciously, a sense of justice which you as a member of your community have. Now, this may come from coffee klatches, from newspapers, through television, through schools, through any number of things. You bring that to your sense of justice.

JA at 1046, 1065.

The trial judge's introductory remarks, if objectionable at all, do not amount to plain error requiring reversal. They were made in explanation of the common-law principle that one has a right to be tried by a jury of one's peers. This basic tenet of our judicial system is reflected in the Jury Selection and Service Act of 1968, as amended, which states that "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861.

Moreover, the approved circuit instructions on the proper role and duties of a juror were given at the beginning of the trial and after closing arguments the judge reiterated that the jury was bound by oath to follow the court's instructions with regard to the law, applying it to the facts as found by the jury. These additional instructions minimize the likelihood that anything said by the trial judge in his introductory comments could have been misinterpreted by the jury and would have clarified any doubt in a juror's mind that

he or she was to apply the law as identified by the court. The district court, therefore, did not commit plain error.

### Dismissal of Jurors by the District Court

Dr. Paul contends that the trial judge committed plain error by dismissing venire members during *voir dire* for expressing opinions about the IRS, without probing further to ascertain if the jurors in question would be capable of putting such opinions aside. Dr. Paul argues that as a result of the judge's actions, the jury impaneled was "pro" IRS and thus Dr. Paul was denied an opportunity to be heard by an impartial jury, in violation of the Sixth Amendment.

■ The district court has the duty and authority to dismiss jurors for cause. *See* 28 U.S.C. § 1870. In addition, "[t]he scope of questions permitted to be asked on *voir dire* examination is generally a matter addressed to the sound discretion of the court." *Eisenhauer v. Burger*, 29 Ohio Misc. 138, 431 F.2d 833, 836 (6th Cir.1970). *See also United States v. Anderson*, 562 F.2d 394, 397 (6th Cir.1977). The district judge asked a number of routine questions of jurors in order to ascertain if any one's past experiences with the IRS would affect their ability to evaluate the evidence presented at trial in a fair or impartial manner. Considering that much of this case deals with tax fraud, the trial judge did not abuse his discretion when he dismissed jurors for having strong opinions about the IRS when the jurors admitted to the court that they either did not think they would be fair or impartial in their evaluation of the evidence presented in relation to the IRS or were not sure. Furthermore, it is not enough for Dr. Paul to show that the trial court's decision to exclude the jurors in question was improper. He must also show that the jury selected was biased. *See Hill v. Brigano*,

199 F.3d 833, 844 (6th Cir.1999) (citing *Ross v. Oklahoma,* 487 U.S. 81, 83–85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988)). Dr. Paul, however, does not provide any evidence that the jury selected was biased. The trial court did not commit plain error in dismissing the jurors in question and there was no evidence of bias in the jury that was impaneled in this case.

### Ex parte *Communications*

Dr. Paul contends that the trial judge erred by engaging in *ex parte* communications with jurors during the trial and that according to our decision in *Standard Alliance Industries, Inc. v. Black Clawson Co.,* 587 F.2d 813, 828 (6th Cir.1978), such conduct raises a presumption of reversible error that cannot be rebutted. However, the situation in this case differs markedly from the situation in *Standard Alliance,* in which there was absolutely no record of the court's *ex parte* contact, which was conducted through the court's law clerk, and to which the defendant had no opportunity to object during his trial. Moreover, since *Standard Alliance,* the Supreme Court has refined the law in this area, providing us with guidance for considering claims of judicial *ex parte* communications.

The right of the accused to be present during all critical stages of a trial against him is fundamental. *See Rushen v. Spain,* 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); Fed.R.Crim.P. 43. *Ex parte* communications are absolutely discouraged and a question from the jury should be answered in open court, after providing the defendant with an opportunity to be heard. *See Rogers v. United States,* 422 U.S. 35, 39, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. Reynolds,* 489 F.2d 4, 7–8 (6th Cir.1973). Nevertheless, even if a judge improperly participates in *ex parte* communications, such

communications will not necessarily constitute reversible error. *See Rushen,* 464 U.S. at 118–19, 104 S.Ct. 453; *Miller v. Am. President Lines. Ltd.,* 989 F.2d 1450, 1468 (6th Cir.1993). There must be a reasonable possibility that the *ex parte* communications affected the verdict.

■ In this case the judge properly disclosed in open court and on the record that he had communicated *ex parte* with the jury. *See Rushen v. Spain,* 464 U.S. 114, 119–20, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (stating that "[w]hen an ex parte communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties."). If Dr. Paul's counsel had been concerned about the communications relayed by the judge, he could have voiced his concern to the district court and an appropriate record could have been made. Counsel having failed to object at trial, our review is limited to a plain error analysis in which we must determine if the judge's responses to the inquiries of the jurors affected the defendant's substantial rights. *Olano,* 507 U.S. at 736, 113 S.Ct. 1770. However, Dr. Paul offers no evidence that the communications in question affected his substantial rights, making it unnecessary to determine whether or not the fairness, integrity or public reputation of the trial was affected.

The *ex parte* communications in question do not appear to raise a reasonable possibility of prejudice. The communications were related to the general well-being of the jurors, the way in which the lawyers were handling the exhibits, and the fact that the lawyer for the United States Attorney's office was speaking too softly, making it difficult for the jurors to hear him. As pointed out by the Supreme Court in *Rushen,* 464 U.S. at 118, 104 S.Ct. 453, there "is scarcely a lengthy trial in which one or more jurors do not have

occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." There appears to be nothing in the content of what was communicated that would adversely affect Dr. Paul's substantial rights. Dr. Paul suggests that these communications should be viewed in the light of other comments made by the judge that suggested he viewed Dr. Paul with "disdain." However, each detrimental comment made by the judge and referred to by Dr. Paul occurred only after the jury had announced its verdict. Although the comments made by the judge are disparaging towards Dr. Paul, such comments are noticeably absent from the rest of the record, suggesting that the judge was careful not to make such comments before the jury rendered a verdict. In sum, there is no evidence to support Dr. Paul's contention that the *ex parte* communications between the judge and the jury during the course of this trial had any affect on Dr. Paul's substantial rights.

2. Motion for Acquittal

Following the close of the government's evidence, Dr. Paul moved unsuccessfully for a judgment of acquittal pursuant to Fed.R.Crim.P. 29 with regard to the bank fraud charge, arguing that the government had not presented sufficient evidence to support its claim. In determining whether the evidence presented at Dr. Paul's trial was sufficient to support a conviction, "[t]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Kelly*, 204 F.3d 652, 656 (6th Cir.2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original) (internal quotation marks and citation omitted)). All reasonable inferences are to

be drawn in the government's favor. *Ibid.* Moreover, since Dr. Paul failed to renew his motion at the end of his trial, we review the district court's denial "for plain error and can reverse only if there is a 'manifest miscarriage of justice.'" *United States v. Beaver*, No. 97–2224/48/70, 97–2343/4, 98–1012/5/76/1155, 2000 WL 491538, at ——4 (6th Cir. Apr. 20, 2000) (quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir.1998)).

In order to convict Dr. Paul for bank fraud under 18 U.S.C. § 1344, the government must prove that Dr. Paul 1) knowingly executed or attempted to execute a scheme to defraud a financial institution; 2) did so with the intent to defraud; and 3) that the financial institution was insured by the FDIC. *See United States v. Everett*, 270 F.3d 986, 989 (6th Cir.2001); *United States v. Hoglund*, 178 F.3d 410, 412–13 (6th Cir.1999). Dr. Paul contends that the government failed to demonstrate that he had any knowledge of the fraudulent statements and misrepresentations made by Snider in order to obtain the mortgage for his Michigan home, and thus failed to prove the specific intent requirement contained in the second element of the crime. Alternatively, Dr. Paul argues that because the Mortgage House, the institution from which Snider, and allegedly Dr. Paul, fraudulently obtained a mortgage, was not federally insured, the government did not prove the third element of bank fraud, despite the fact that the Mortgage House sold the mortgage to a federally insured institution at closing on the property.

■ First, there is ample evidence to support the conclusion that Dr. Paul knowingly acted in collusion with Snider as part of a scheme to obtain a mortgage on the basis of fraudulent information and that this was done with the intent to defraud. Snider's testimony supports this conclu-

sion, as he states that Dr. Paul originally formulated the plan, helped Snider to fraudulently fill out the loan application taken by the Mortgage House, assisted Snider in falsifying his tax returns for the loan application, offered proof to the bank that he had received a down payment of $60,000 from Snider, even though Dr. Paul had not, and finally helped Snider obtain a fraudulent gift letter to be used as evidence of the source of the down payment to the mortgage broker.

Second, it is not necessary for the Mortgage House to have been a federally insured entity in order to prove bank fraud. It is sufficient to demonstrate that the "defendant in the course of committing fraud on *someone* causes a federally insured bank to transfer funds under its possession and control." *United States v. Everett*, 270 F.3d 986, 989 (6th Cir.2001). In this case, at closing on Dr. Paul's Michigan home, Snider signed a mortgage with The Mortgage House and immediately thereafter at closing that mortgage was assigned to St. Paul Federal Bank on the basis of a commitment letter in which the Federal Bank agreed to purchase the mortgage on the Michigan property. The representative from the Mortgage House testified to the fact that the false information provided to her by Snider in his loan application was forwarded to St. Paul Federal Bank and the Federal Bank representative at trial testified that the bank approved the loan on the basis of that falsified mortgage application. Under the *Everett* standard, the entire question of whether or not Dr. Paul knew that St. Paul Federal Bank or any bank was to hold the mortgage is moot. If Dr. Paul was deemed to have participated in creating the fraudulent application that was subsequently relied upon by the Federal Bank to transfer funds in its possession and control to Dr. Paul, there is sufficient evidence of bank fraud.

Moreover, there is evidence to suggest that Dr. Paul knew that St. Paul Federal Bank was to hold the mortgage on the property. The representative from the Mortgage House testified that upon receipt of the commitment letter from the Federal Bank, she informed Snider of its acceptance of the mortgage. In addition, Snider testified to the fact that he told Dr. Paul of this fact. Furthermore, the representative from St. Paul Federal Bank testified that both parties knew at closing that the bank was lending the money for the sale of the property.

The evidence relied upon by the government in its case against Dr. Paul on the count of bank fraud is witness testimony, which in this case the jury found to be credible. It is not our position to second-guess the jury's assessment upon review. We generally avoid making such a determination, noting that the opportunity of the trial court to assess witness testimony is superior to that of the appellate court. *See United States v. Garcia*, 866 F.2d 147, 151–52 (6th Cir.1989). *See also United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir.2000) (noting that "[s]ufficiency-of-evidence appeals are 'no place ... for arguments regarding a government witness's lack of credibility.'") (citations omitted). Accordingly, we hold there to be sufficient evidence for Dr. Paul's conviction of bank fraud and affirm the district court's denial of Dr. Paul's motion to acquit on that basis.

### 3. Mail Fraud Counts

Dr. Paul contends that since there is insufficient evidence to find him guilty of bank fraud, the mail fraud charges, which are predicated on the scheme to defraud St. Paul Federal Bank, must fail as well. In light of our holding that the government presented sufficient evidence at trial

to find Dr. Paul guilty of bank fraud, his objection to the mail fraud counts must fail.

4. Evidence Admitted of Financial Transactions by Dr. Paul

Dr. Paul contends that the trial court abused its discretion in admitting evidence of Dr. Paul's handling of the proceeds he obtained from the sale of his Michigan home in 1999, after having paid off the St. Paul mortgage, removing Snider as the owner of record and selling the house to a bona fide purchaser at a substantial profit.

Dr. Paul contends that the evidence proffered was irrelevant and thus violated Rule 402 of the Federal Rules of Evidence, that its probative value was substantially outweighed by the danger of unfair prejudice, and that specific notice of the government's intention to introduce this evidence was not provided, in violation of Rule 404(b) of the Federal Rules of Evidence. Dr. Paul further argues that the admission of this evidence affected his substantial rights and that the judgment should, therefore, be vacated and a new trial ordered by this court.

Dr. Paul filed a pre-trial motion *in limine*, seeking to bar the government from introducing the evidence in question; however, the trial court denied that motion. At trial, Dr. Paul renewed his objection, but it was overruled. We review the trial court's decision to admit the evidence for abuse of discretion. *See United States v. Bonds*, 12 F.3d 540, 554 (6th Cir.1993).

The evidence admitted described how Dr. Paul took the proceeds of his house sale ($120,767.47) and broke it down into a number of cashier's checks, periodically cashing each one, taking a small amount of cash and putting the remainder into a new cashier's check. The government argues that this evidence was relevant to the government's case. The government contends that Dr. Paul handled the proceeds of the sale of his house in this unique way in order to avoid creating a trail to a bank account, in an effort to continue to deceive the IRS.

"Broad discretion is given to district courts in determinations of admissibility based on considerations of relevance and prejudice, and those decisions will not be lightly overruled." *United States v. Jackson–Randolph*, 282 F.3d 369, 376 (6th Cir.2002). The evidence proffered by the government is reasonably relevant to the crime as subsequent acts that demonstrate an intent to defraud and Dr. Paul does not offer an argument as to why the evidence is unfairly prejudicial to the defense. Furthermore, the record indicates that the government gave notice of its intention to include this information in a brief filed one week before trial, describing the inclusion of this evidence in some detail, in response to Dr. Paul's motion *in limine*. In so doing, the government provided sufficient notice. *See United States v. French*, 974 F.2d 687, 694–95 (6th Cir.1992) (finding no violation of the Fed.R.Evid. 404(b) notice requirement where the government informed the defense of its intent to offer evidence of prior bad acts one week before trial and no motion for a continuance was made). Dr. Paul's three objections to the admission of this evidence fail.

5. Jury Instructions

During deliberations, the jury sent a written question to the judge, which asked "[i]f payments are being made on a fraudulent loan and these payments are mailed—are those payments mail fraud just because the initial loan agreement is fraudulent?" JA at 19. The court notified the parties that the question was asked, and answered the jurors with a note that read: "See instruction 'Use of Mails—Defined' (page 33) and specifically the third

and fourth paragraphs." The third and fourth paragraphs referred to by the court state the following:

> The Government must prove beyond reasonable doubt, however, that the mails were, in fact, used in some manner to further, or to advance, or to carry out the scheme to defraud or scheme to obtain money or property by false or fraudulent pretenses, representations or promises. The Government must also prove that the use of the mails would follow in the ordinary course of business or events or that the use of the mails by someone was reasonably foreseeable.

> It is not necessary for the Government to prove that the item itself mailed was false or fraudulent or contained any false or fraudulent statement, representation, or promise, or contained any request for money or thing of value.

Dr. Paul maintains that the district court erred in not providing him with an opportunity to respond to the jury's note and that therefore we should remand this case for a new trial. Under Rule 43 of the Federal Rules of Criminal Procedure, a defendant shall be present "at every stage of the trial." The rule requiring a defendant's presence at every stage of the trial must be reviewed by this court for harmless error under Fed.R.Crim.P. Rule 52(a). *See United States v. Harris,* 9 F.3d 493, 499 (6th Cir.1993). This court has held that an *ex parte* communication of this type, between the judge and the jury during its deliberations, will not result in reversal if there is no reasonable possibility of prejudice. *Ibid.See also United States v. Giacalone,* 588 F.2d 1158, 1165 (6th Cir.1978) (quoting *United States v. Reynolds,* 489 F.2d 4, 8 (6th Cir.1973)). This court has alternatively said that such an error "is reversible only if the court's response to the question is confusing, misleading or potentially harmful to the de-

fendant, or results in 'a miscarriage of justice.'" *United States v. Combs,* 33 F.3d 667, 670 (6th Cir.1994). In this case, Dr. Paul has not successfully demonstrated how the court's instructions could have created a reasonable possibility of prejudice. The court did not make a substantive response to the jury's note, but instead mechanically referred back to the jury instructions that had been previously given. *Cf. Combs,* 33 F.3d at 670 (holding that although the district court erred in failing to assemble the parties and the jury in the courtroom in order to render supplemental instructions, the instructions were legally correct and therefore the error did not result in a "grave miscarriage of justice."); *Giacalone,* 588 F.2d at 1164 (harmless error to tell jury to continue deliberations after receiving a note informing court that jury was deadlocked); *United States v. Florea,* 541 F.2d 568, 570–71 (6th Cir.1976) (harmless error to allow agent to replay tapes admitted into evidence at the request of the jury, without the presence of the parties).

The district court erred in failing to assemble the parties and the jury in the courtroom in order to render the supplemental instructions; however, there was no reasonable possibility of prejudice towards Dr. Paul as a result, because the judge's note simply referred back to the original jury instructions. This error was, therefore, harmless and on this basis we affirm the district court's denial of Dr. Paul's motion for a new trial.

**6. Calculation of Tax Loss**

■ The district court determined the tax loss to the government under the Sentencing Guidelines to be $327,302.93. This figure was based on a total of three amounts. First, the court calculated the assessed tax without penalties and interest for the period covered by the Offer–in–

Compromise, which came to $134,105.63. This figure is undisputed. Second, the court calculated the amount of tax Dr. Paul avoided on his 1993 income tax return when he failed to disclose the gross proceeds from his Idaho medical practice to be $180,952.30. This second figure is disputed by Dr. Paul. The government produced at trial two different methods by which Dr. Paul's income from the Idaho practice during 1993 and 1994 could be calculated. On the one hand, the government introduced the patient checks that Dr. Paul had deposited into his various bank accounts and had a revenue agent calculate for the court, based on those deposits, the amount of tax that Dr. Paul would have owed. The expert calculated that Dr. Paul would have owed $54,571.40. In the alternative, the government introduced Dr. Paul's own business records, as kept by his office manager, Kaye Sewell, which reflected a considerably larger revenue from the Idaho practice. The final amount of tax owed, based on Ms. Sewell's records, came to $180,952.30. The court chose to use the tax debt calculated on the basis of Ms. Sewell's records and at sentencing Dr. Paul objected, stating that Ms. Sewell's testimony and records were unreliable. Third and finally, the court calculated the tax Dr. Paul avoided on his 1994 income tax return to be $12,245. This figure is undisputed. Dr. Paul also objects to the fact that the district court did not reduce the calculated tax loss by the $50,000 he paid in connection with the Offer–in–Compromise.

In examining factual determinations made by the district court for the purpose of applying the Sentencing Guidelines, we review for clear error. 18 U.S.C. § 3742(e); *United States v. Pierce*, 17 F.3d 146, 151 (6th Cir.1994). We review *de novo* the application of the Sentencing Guidelines to a particular set of facts. *See United States v. Morrison*, 983 F.2d 730,

732 (6th Cir.1993). Thus, the first issue, centering on whether or not Ms. Sewell's testimony and records are reliable, is reviewed for clear error. The district judge's response to Dr. Paul's objection on this point demonstrates that he carefully weighed the evidence before him and decided that Ms. Sewell's records were likely to be more accurate. The judge noted that the government might not have found all of the bank accounts that Dr. Paul had opened while practicing in Idaho and that there was evidence demonstrating that Dr. Paul had paid for things by signing over checks he received from patients. In either case, the government's first figure would not have taken these variables into account, while Ms. Sewell's calculations would not have had the same problem. Although Dr. Paul claims that Ms. Sewell's records were unreliable and that she was biased, the judge noted that the jury found Ms. Sewell's testimony to be credible. In sum, the district court did not clearly err in its decision to use Ms. Sewell's records in order to calculate the tax loss at stake.

We review *de novo* the issue of whether the amount paid by Dr. Paul in connection with the Offer–in–Compromise should have been subtracted from the overall tax loss, since it requires an application of the Sentencing Guidelines to a particular set of facts. The government argues that the district court did not err since the Sentencing Guidelines specifically state that "[t]he tax loss is not reduced by any payment of the tax subsequent to the commission of the offense." USSG § 2T1.1(c)(5). Dr. Paul contends that the commission of the offense actually occurred when the IRS accepted Dr. Paul's final Offer–in–Compromise and that the money paid in association with that acceptance does not fall under the auspices of § 2T1.1(c)(5), since it is not a payment made subsequent to the relevant offense.

The district court established two categories of offenses for the purposes of sentencing under the guidelines, pursuant to USSG § 3D1.2. The first group, known as the "Count Group 1" contained Counts One, Two, and Three, all of which involved Dr. Paul in a common scheme of tax evasion. The base offense level assigned to Dr. Paul for Count Group 1 was 17, based on the calculation done by the court that his calculated tax loss came to $327,302.93. Therefore, the "offense" to which the tax payment must be subsequent includes any of the offenses contained in this common scheme of tax evasion. Count One of the indictment, on which the jury returned a guilty verdict, charges Dr. Paul with willfully attempting to evade and defeat the payment of a substantial portion of the assessed taxes owed by him "from on or about December 14, 1993 to on or about May 27, 1994." December 14, 1993 was chosen because it was when Dr. Paul submitted the first Offer–in–Compromise, which was later rejected by the IRS. Therefore, the money paid in association with the Offer–in–Compromise in April 1994 was made subsequent to the relevant offense and is subject to USSG § 2T1.1(c)(5). We affirm the district court's ruling on this matter.

### 7. Sentence Enhancements

Dr. Paul now appeals the district court's decision to apply three sentence enhancements, ultimately increasing his sentence by six levels on the basis of sophisticated concealment, his aggravating role, and for obstruction of justice. We review the district court's findings of fact with respect to the application of the enhancement for clear error, but review legal conclusions as to whether the facts justify an enhancement *de novo*. *See United States v. Morris*, 3 Fed.Appx. 223 (6th Cir.2001) (reviewing the application of a sentence enhancement under USSG § 2T1.1 for sophisticated concealment by the defendant, making the offense difficult to detect); *United States v. Caseslorente*, 220 F.3d 727, 734 (6th Cir.2000) (reviewing the application of a sentence enhancement under USSG § 3B1.1 for the defendant's role in the offenses he committed); *United States v. Sabino*, 307 F.3d 446, 448 (6th Cir.2002) (reviewing the application of a sentence enhancement under USSG § 3C1.1 for the defendant's obstruction of justice).

### Sophisticated Concealment Enhancement

The Sentencing Guidelines provide for a sentence enhancement of two levels for tax evasion offenses involving "sophisticated concealment." USSG § 2T1.1(b)(2). Sophisticated concealment is defined as "especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect." USSG § 2T1.1, comment. (n.4). The Commentary points out that '[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment.' *Ibid.*

█ In general, complex schemes of tax evasion warrant imposition of the sophisticated concealment enhancement. In *United States v. Butler*, 297 F.3d 505 (6th Cir.2002), this court affirmed the application of a sophisticated concealment enhancement where the defendant set up shell corporations, used post office drop boxes, aliases, and different bank accounts to conceal his tax evasion. In *Sabino*, 274 F.3d 1053, this court affirmed the application of a sophisticated concealment enhancement where the defendant had used at least seven trusts to avoid payment of taxes, noting that the IRS investigation had been lengthy and com-

plex. In *United States v. Middleton,* 246 F.3d 825 (6th Cir.2001), this court affirmed the application of a sophisticated concealment enhancement where the defendant had deposited his receipts into non-interest-bearing business bank accounts, had opened accounts at several different banks, had used several different company names to open these accounts, including one in which he had no ownership interest, had traveled to different branches of the same bank to make structured withdrawals of amounts less than $10,000, and had paid all of his bills using cash, money orders, or endorsed business checks without ever retaining a receipt or other record of the transaction.

The district court, in justifying its enhancement of Dr. Paul's sentence for sophisticated concealment, noted that Dr. Paul opened five different bank accounts in three states, supplied a false social security number to the IRS, paid his employees with cash, personal checks, and checks from a business other than his medical practice, required the buyer of his home in Michigan to enter into a confidentiality agreement that prevented the new owner of the house from disclosing any facts or circumstances of the land purchase, and carefully broke down the check he had received from the sale of the Michigan property into amounts that were below $10,000 in order to avoid alerting the IRS to his activities when depositing this money into various accounts. Moreover, the court took notice of the scheme between Dr. Paul and Snider in conducting the straw sale purchase of his Michigan home. All of these factors point to an elaborate plan to conceal Dr. Paul's tax evasion, relatively similar to the one described in *Middleton.* The district judge did not commit clear error in assessing Dr. Paul a sentence enhancement for sophisticated means.

*Aggravating Role Enhancement*

▉ The Sentencing Guidelines provide a sentence enhancement for an individual's aggravating role in the commission of an offense. USSG § 3B1.1. In particular, the guidelines direct a sentencing court to increase a defendant's offense level by two levels "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity...." The Commentary gives examples of factors to be considered in determining whether the defendant had a leadership role:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity and the degree of control and authority exercised over others.

USSG § 3B1.1, comment. (n.4).

In this case, the district judge enhanced Dr. Paul's sentence because of his leadership role in the straw sale purchase of his Michigan home. The judge points out that Dr. Paul came up with the idea, planned the offense, recruited Snider and others, such as Kaye Sewell and the man who fronted Dr. Paul the money for the down payment in the straw sale of his Michigan property, and directed them in the commission of the crime, exercising a considerable degree of control over Snider in particular. Furthermore, the judge points out that Dr. Paul was the only participant to gain financially from the transaction.

Dr. Paul cites to the case of *United States v. Vandeberg,* 201 F.3d 805, 812 (6th Cir.2000), in which this court held that the record did not support the imposition of a two-level enhancement to a defendant's

sentence for being an organizer, leader, manager, or supervisor of criminal activity pursuant to USSG § 3B1.1, even though the defendant had provided his co-conspirator with information that was crucial to helping the co-conspirator burglarize a home. However, in *Vandenberg,* there was no evidence indicating that the defendant had either recruited his co-conspirator, exercised any authority over him, or had taken a leadership role in planning the crime. *Id.* at 811. Moreover, the defendant in *Vandeberg* did not take a larger share in the profits garnered from the burglary. *Ibid.* Dr. Paul's role is not comparable, since there was evidence to support the conclusions reached by the district court in this case that Dr. Paul had recruited Snyder and others into defrauding the IRS, had exercised control over Snyder, had masterminded the straw sale of his Michigan home, and had reaped a far greater financial gain as a result of his crime than anyone else involved. The district court did not commit clear error in applying the two-level enhancement for Dr. Paul's leadership role in the commission of the offense.

### Obstruction of Justice Enhancement

The Sentencing Guidelines provide for a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1. The guidelines provide that:

If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1. The non-exhaustive list of examples of obstructive conduct found in the Commentary includes in relevant part:

. . .

(b)committing, suborning, or attempting to suborn perjury;

. . .

(f)providing materially false information to a judge or magistrate;

(g)providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense;

. . .

USSG § 3C1.1. comment. (n.4).

■ The district court found that Dr. Paul was eligible for a sentence enhancement on the basis of obstruction of justice because Dr. Paul had perjured himself in the submission of his Offer–in–Compromise, which was signed "under penalty of perjury," on December 14, 1993. Moreover, the court held that Dr. Paul had willfully perjured himself on the witness stand on several material points, when Dr. Paul declared that he had not filled out the documents relating to the Offer–in–Compromise, had never used a false Social Security number and that Snider alone committed the bank fraud.

As in this case, the application of an enhancement on the basis of obstruction of justice is generally dependant upon credibility determinations and thus a district court has considerable discretion in determining whether the obstruction enhancement applies. *See United States v. Moss,* 9 F.3d 543, 553 (6th Cir.1993). Here, the district court did not err in its application of the obstruction of justice enhancement. Dr. Paul contends that the judge's determinations with regard to Dr. Paul's credibility were unreasonable, but the evidence

and the jury's conviction prove otherwise. We affirm the district court's ruling.

8. Conditions on Supervised Release

The Sentencing Guidelines permit the trial court to add specific conditions to the supervised release of a defendant, stating that:

The court may impose other conditions of supervised release to the extent that such conditions (1) are reasonably related to (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; and (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (2) involve no greater deprivation of liberty than is reasonably necessary for the purposes set forth above and are consistent with any pertinent policy statements issued by the Sentencing Commission.

USSG § 5D1.3(b). In addition, the Guidelines recommend that the court impose certain conditions, including that the "defendant shall refrain from excessive use of alcohol...." USSG § 5D1.3(c)(7). Moreover, the Guidelines note that certain "special conditions" may be appropriate on a case-by-case basis, including community service. Since Dr. Paul did not object at sentencing to the conditions set by the district court, we review for plain error. See United States v. Vincent, 20 F.3d 229 (6th Cir.1994).

 The district court imposed two conditions on Dr. Paul's supervised release. First, the district court required that Dr. Paul refrain from consuming alcohol. Dr. Paul contends that there is no

basis for this condition and that it should be eliminated. The record, however, reflects that Dr. Paul was arrested twice for incidents that related to an abuse of alcohol. Dr. Paul was once charged with operating a vehicle under the influence, and was allowed to plead guilty to the lesser included offense of operating while impaired. A few years later, Dr. Paul was arrested for resisting and obstructing an officer who had pulled him over for speeding, weaving, and other traffic offenses, and attempted to conduct a sobriety test. As a result of the second arrest, Dr. Paul was required to participate in alcohol counseling and his driver's license was suspended for a year.

This court has consistently held that the imposition of a special condition is within the district court's discretion if that condition is "reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public." United States v. Bortels, 962 F.2d 558, 560 (6th Cir.1992). In addition, the Sentencing Guidelines specifically provide that if the court has reason to believe that the defendant has an alcohol problem, conditions requiring that the defendant participate in abuse programs that include testing for the substance to ensure abstinence are appropriate. USSG § 5D1.3(d)(4). Given Dr. Paul's criminal record, it is not unreasonable to assume that he may have a substance abuse problem and therefore the district court did not commit clear error in requiring that Dr. Paul refrain from consuming alcohol during his supervised release. Cf. United States v. Modena, 302 F.3d 626, 636–37 (6th Cir.2002) (holding that the district court's requirement that the defendant abstain from the use of alcohol during his term of supervised release was an abuse of discretion since there was nothing in the record to

indicate that the defendant had a substance abuse problem).

 The second condition required by the court is that Dr. Paul perform 300 hours of community service in a non-medical related field. The court explained that it was putting this restriction on Dr. Paul in order to help Dr. Paul to regain a more realistic picture of himself as a normal human being, and not as an important doctor. This special condition is intended to serve the permissible goal of rehabilitation. *See Bortels,* 962 F.2d at 560. We affirm the district court's imposition of these two conditions.

### III

For the reasons given above, we AFFIRM Dr. Paul's conviction and sentence.