IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 16, 2018

## STATE OF TENNESSEE v. DONALD LYNDON MADEWELL

**Appeal from the Circuit Court for Warren County**
**No. 2016-CR-944     Larry B. Stanley, Jr., Judge**

### No. M2018-00183-CCA-R3-CD

The Defendant, Donald Lyndon Madewell, was convicted by a jury of promoting the manufacture of methamphetamine. On appeal, he challenges the denial of his motion to suppress, asserting that he lacked common authority over the hotel room and could not provide valid consent to search. He also alleges that evidence was insufficient to support his conviction. After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Daniel J. Barnes, Sparta, Tennessee, for the appellant, Donald Lyndon Madewell.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Lisa S. Zavogiannis, District Attorney General; and Matthew T. Colvard, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
## FACTUAL BACKGROUND

This case arises from a March 24, 2016 warrantless search of the hotel room wherein the Defendant and Patricia Leigh Fulcher ("co-defendant") were found. Following the seizure of evidence discovered during the search of that hotel room, the Warren County Grand Jury, in August 2016, charged the Defendant and his co-defendant with promoting the manufacture of methamphetamine, a Class D felony; simple possession of methamphetamine, a Class A misdemeanor; and possession of drug paraphernalia, a Class A misdemeanor. See Tenn. Code Ann. §§ 39-17-425, -433(a)(1), -434(b).

The Defendant filed a pretrial motion to suppress the seized evidence, alleging that the warrantless search was unconstitutional. The Defendant argued that, although he consented to the search of the hotel room, his co-defendant did not, and that his consent was invalid because he did not possesses common authority over the premises. A hearing was held on the motion on April 12, 2017, and the motion was denied by a written order that followed on April 20, 2017.

The Defendant proceeded to a jury trial on May 4, 2017. The jury found the Defendant guilty of both possession charges; however, the jury could not agree on the promoting the manufacture of methamphetamine charge. Due to the hung jury, the trial court declared a mistrial on the promoting the manufacture of methamphetamine charge and reset that charge for a new trial. The Defendant was sentenced to concurrent terms of eleven months and twenty-nine days for the Class A misdemeanors. The Defendant proceeded to a second trial on the promoting the manufacture of methamphetamine charge on September 7, 2017.

Lieutenant Ben Cantrell with the McMinnville Police Department testified he had extensive training in the detection and investigation of methamphetamine manufacturing operations. Lieutenant Cantrell stated that methamphetamine could be made in different ways but that the "two popular different ways" of manufacturing methamphetamine were referred to as the "red P" or "red phosphorous" method and the "one-pot" or "shake-and-bake" method. Lieutenant Cantrell explained that the one-pot method resulted in a powder form of methamphetamine whereas the red phosphorous method resulted in a rock-like substance called "ice." In addition, the red phosphorous method required a heating source, but with the one-pot method, all of the ingredients were contained in a Gatorade or two-liter plastic bottle and "it create[d] its own heat, create[d] its own reaction." Lieutenant Cantrell described that, with the one-pot method, several different things are combined and put into the plastic bottle along with another "solid or . . . liquid normally Coleman fuel" to produce "meth oil," and after the meth oil "comes to the top," it is "extracted and crystallized." The extraction process involved "some sort of dropper or beaker" to remove the meth oil "and put [it] into another container." Lieutenant Cantrell continued by explaining that there were "two ways" the oil "gases off" or crystallizes:

> You can take either muriatic acid and little bits of aluminum foil, and it creates hydrochloric gas. You run a tube from that container where the muriatic acid and the aluminum foil [are] combined and you run that . . . into the meth oil and it crystallizes it. You can either use muriatic acid and aluminum foil, or you can use rock salts and sulfuric acid either one. Both of them create hydrochloric gas and that's what the tubing is used for.

Lieutenant Cantrell testified that he went to the Scottish Inn in McMinnville on the morning of March 24, 2016, to serve an outstanding "child support warrant" on the co-defendant. When Lieutenant Cantrell knocked on the door of Room 118, he "could hear a male voice inside ask who is it." Lieutenant Cantrell said that it was "the police department" and told the man to "[c]ome to the door." According to Lieutenant Cantrell, he then heard about ten to fifteen seconds of "rummaging around inside the room" before the Defendant opened the door. Lieutenant Cantrell described that "it sounded like people were rushing around[,] and [he] could hear different things moving." Lieutenant Cantrell said that, when the Defendant opened the door, "it was a little strange" because the Defendant "just left it open and then stepped backwards into the room several feet and just stood there." Lieutenant Cantrell "stepped up on the threshold of the door" and saw a woman, Stephanie Evagues, sitting on the bed. When Lieutenant Cantrell asked the Defendant where his co-defendant was located, the Defendant did not verbally respond, "but he just kind of cut his eyes in the bathroom and kind of nodded[.]" Lieutenant Cantrell walked to the bathroom door, which was not shut completely, and opened it and saw the co-defendant "standing there next to the toilet[.]" Lieutenant Cantrell instructed her "to come out" and placed her under arrest.

As Lieutenant Cantrell was arresting the co-defendant, he noticed that the Defendant was "standing on a section of tubing," which Lieutenant Cantrell knew from his experience was "commonly used in the manufacture of meth." Lieutenant Cantrell testified that both defendants spontaneously said that they found the tubing outside and brought it inside. After seeing the tubing, Lieutenant Cantrell expressed his concern that there was "either a meth lab or meth lab components in" the hotel room. According to Lieutenant Cantrell, the Defendant said that "there was not anything illegal in the hotel room" and gave consent to search the room. The Defendant and Ms. Evagues waited outside the room while the search was conducted. According to Lieutenant Cantrell, he did not ask the co-defendant for consent to search the room because she "had kind of become argumentative" and "uncooperative" with him and another officer, so they "placed her in a patrol unit."

Lieutenant Cantrell testified that the Defendant told him that he had been staying in the hotel room with the co-defendant for approximately two weeks and that they were in a relationship. Detective Cantrell obtained the hotel room receipt before he left the scene, which noted that the room was in the co-defendant's name and confirmed that the room had been rented for about two weeks. After Lieutenant Cantrell spoke "with everybody involved," and the defendants "were claiming possession of the items," Ms. Evagues, who had only been the hotel room for one night, was not charged with anything found during the search of the hotel room and was allowed to leave.

Lieutenant Cantrell inventoried the items that they found in the room, which included: the six-foot section of tubing the Defendant was standing on; a partially full sixteen-ounce bottle of acetone found in the refrigerator; three glass jars "close to one of the beds," one of those jars had white residue on it that field-tested positive for methamphetamine; a propane torch; twenty-five coffee filters "hidden in a corner underneath some clothing"; two bags of methamphetamine in its ice form that were found in the trash can and weighed 0.59 grams in total; two glass drug pipes; three sets of digital scales, one of those with "white residue in the corner"; thirty syringes inside the trash can; and a ten-ounce bottle of butane lighter fluid. According to Lieutenant Cantrell, the coffee filters and acetone were used "towards the end" of the manufacturing process: "After the meth is crystallized, the acetone is commonly used to what we say 'wash' the meth to kind of take the chemical taste out of it." He also relayed that the tubing and glass jars were used during the manufacturing process. Furthermore, the other items confiscated from the hotel room were "associated with use of meth[.]" Lieutenant Cantrell explained that "[a] common way of using methamphetamine" involved a propane torch and syringes: "[I]f it's in a powder form or crystal form, you melt it down in a spoon—usually by a torch at the bottom of a spoon—melt it down to a liquid form and then inject it" with a syringe. Lieutenant Cantrell acknowledged that some of the inventoried items were "common household items," but he opined that they were found "in odd places" in the hotel room.

When Lieutenant Cantrell was asked why he did not charge the defendants with the initiation of the process to manufacture methamphetamine, he said that, for the initiation charge, he needed "something there saying that the process had started[, s]uch as some pseudoephedrine . . . ground up" or all of the ingredients "combined in one bottle." Lieutenant Cantrell explained that he charged promotion rather than initiation in this case "because [the defendants] had different parts of the process all in the same room, but it wasn't in working order so to speak." Stating it another way, Lieutenant Cantrell said, "You'd have to have the ground-up pseudoephedrine or you'd have to have the actual one-pot working. You couldn't just have bits and pieces so to speak." Lieutenant Cantrell confirmed that the process allegedly being used in the hotel room was the one-pot method and that the ice form of methamphetamine found in the two bags in the room "was not a product of that reaction." Nonetheless, the white residue seen on the glass jar was consistent with the one-pot method.

Lieutenant Cantrell opined that "this [was] a meth lab either that ha[d] been used or [would] be used" to manufacture based upon the following:

> The tubing . . . is used in the gassing off process. The tubing was dirty. It . . . wasn't clear. You can tell it had been fogged over. It had stuff on the inside. It had been used.

The acetone . . . is used to wash the methamphetamine.

The glass jar with the white residue that actually tested positive for meth, the white residue was still wet indicating it was somewhat recent. I don't know how recent, but it hadn't had time to dry out is all I can tell you[.]

And the coffee filters.

[W]hen all of these items are together, a methamphetamine cook has taken place or is going to take place or they're starting to gather items to do that.

Lieutenant Cantrell testified that he believed a "cook" had occurred within the last twenty-four hours. He confirmed, however, that there was no odor of a recent cook when he arrived at the hotel room. In addition, only some of the components to manufacture methamphetamine were present in the room, and more was needed to actually produce methamphetamine.

After the search was completed, Lieutenant Cantrell spoke with the Defendant, who had been advised of his Miranda rights. Lieutenant Cantrell asked the Defendant what items the Defendant thought the police might have found in the hotel room, and the Defendant mentioned the tubing, torch, and "a lit bit of paraphernalia." The Defendant also mentioned the glass jars, but he claimed that they did not belong to him. After they spoke "a little bit further," the Defendant "stated that he found the glass jars, the tubing, and the acetone in a garbage bag in the parking lot of the hotel and [that] he brought them into his room because he's an addict." After the Defendant was taken into custody, the co-defendant claimed ownership of all of the items in the room. She did so after being told she was going to be charged with promotion and as she was being moved from one patrol car to another at the scene. However, Lieutenant Cantrell did not believe her because they had both been staying in the room for two weeks and that it was not likely that the Defendant "had no knowledge or no part of it."

Warren County Sheriff's Deputy Billy Joe Crouch was working as "the meth truck driver" on March 24, 2016, and after the search was completed, he was called to "neutralize the lab" and "make it environmentally safe" by proper removal of the hazardous items. According to Deputy Crouch, he had "cleared 500 [meth] labs" in the State. Deputy Crouch testified that he also inventoried the items found in the hotel room and was the one who performed the field test on the white residue on the glass jar. Based upon the appearance of the white residue, Deputy Crouch believed that a cook had taken place within a few "hours to days."

Deputy Crouch affirmed that the items he "took and disposed of" from the hotel room were, in his opinion, "components used in the manufacture of methamphetamine." When asked if there was "any doubt in [his] mind as to what that was in that hotel room," Deputy Crouch replied, "From my experience, no, from what I've seen in the past." He further maintained that it "was pretty consistent with other meth labs[.]" However, Deputy Crouch also acknowledged that additional components were needed to complete the manufacturing process.

Following the conclusion of proof, the jury found the Defendant guilty as charged of promoting the manufacture of methamphetamine. The trial court sentenced him as a Range II, multiple offender to seven years' confinement, which sentence was to be served concurrently with the misdemeanor counts. This appeal followed.

## ANALYSIS

On appeal, the Defendant presents the following issues for our review: (1) whether his motion to suppress was improperly denied; and (2) whether the evidence is sufficient to support his conviction. We will address each in turn.

### I. *Motion to Suppress*

Prior to trial, the Defendant filed a motion to suppress the evidence obtained during the search of his hotel room. Citing to State v. Ellis, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000), the Defendant argued therein that he

> lacked common authority to consent to the search of [his co-defendant's] room, as he was not her husband, was not who the hotel room was rented to, that [the] only basis of knowledge of any relationship between the two was unsubstantiated rumors from other officers, and that there were several people that appeared to be visiting the hotel room.

In the motion, the Defendant alleged the following facts supported his position:

> Upon knocking and announcing at [R]oom 118, [the Defendant] answered the door. [Lieutenant Cantrell] came into the room without consent and found [the co-defendant] in the bathroom. She was arrested and led out. Afterwards, the officers asked for consent from [the Defendant], when they were aware that the room belonged to [the co-defendant] and that [the Defendant] could not grant consent to search her room.

The trial court entered a written order denying the motion on April 20, 2017.

-6-

The Defendant essentially raises the same grounds on appeal, contending that he lacked common authority to consent to the search of his co-defendant's hotel room because the room was rented to her, they were not married, the only evidence of any relationship between them came from unsubstantiated rumors, and there was another person present in the hotel room. In addition, the Defendant notes that Lieutenant Cantrell "testified that he attempted to obtain consent from the [co-defendant], the person in whose name the hotel room was rented, for consent, and did not receive it, which indicates that he knew, or at least had reason to believe, that [the Defendant] didn't have the authority to give his consent." He concludes, "[T]he consent given by [the Defendant] to search the hotel room was not valid, and that fact should have been apparent to Lieutenant Cantrell, who was there with the expressly stated purpose of arrest[ing the co-defendant], the room's occupant."

The State initially argues that the Defendant has waived appellate review of this issue by failing to include a transcript of the motion to suppress hearing in the appellate record. In the trial court's written order denying relief, it is noted that a hearing took place on the motion on April 12, 2017, and that the trial court heard testimony from witnesses and arguments from counsel. The order provides only that the motion to suppress "is without merit and is overruled[.]" It is clear that the trial court conducted a hearing on the Defendant's motion to suppress, but the record on appeal does not include a transcript from the hearing. It is well-established that the appellant has an obligation to ensure the record sufficiently provides this court with enough information to allow for meaningful appellate review. See Tenn. R. App. P. 24(b) (mandating that "the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993). Where the record is missing all or a portion of the transcript of the proceedings relevant to an issue presented for review, appellate review of the issue is waived. Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997); Ballard, 855 S.W.2d at 560-61. Accordingly, the Defendant has waived appellate review of the trial court's denial of his motion to suppress. Our review is limited to plain error.

Notwithstanding waiver, the State contends that the Defendant's argument lacks merit. We agree with the State and are not compelled by the facts of the case to consider the matter as one of plain error because no clear or unequivocal rule of law has been breached. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); State v. Minor, 546 S.W.3d 59, 70 (Tenn. 2018); State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

-7-

State v. Ellis, cited to by the Defendant, holds that, in most circumstances, valid consent exists when given "either by the individual whose property is searched or by a third party who possesses common authority over the premises." 89 S.W.3d at 592. Common authority may be established either by demonstrating that the third party in fact possessed common authority as defined above or, alternatively, by demonstrating that the facts available to the searching police officers would have warranted "a man of reasonable caution in the belief that the consenting party had authority over the premises." Id. at 593 (quoting Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990)).

In addition, the fact that a person is an overnight guest in a residence or an apartment, standing alone, is sufficient to clothe the guest with a legitimate expectation of privacy in the premises sufficient to challenge the search and any resulting seizure. State v. Transou, 928 S.W.2d 949, 958 (Tenn. Crim. App. 1996) (citing Minnesota v. Olson, 495 U.S. 91, 96-97 (1990)). The same principles apply to hotel rooms, see Stoner v. California, 376 U.S. 483, 490 (1964); and "an occupant of a hotel [r]oom has a reasonable expectation of privacy there, even though he [or she] is just a guest, not an owner, of the [r]oom," United States v. Caldwell, 518 F.3d 426, 429 (6th Cir. 2008). Indeed, courts have recognized the authority of third-parties sharing hotel rooms to consent to a search of the room even if the room is not registered in their name. See United States v. Kimoana, 338 F.3d 1215, 1222 (10th Cir. 2004) ("Although [d]efendant was not the registered guest who had paid for the room, he had stayed there overnight, left his possessions there, and carried a key to the room. This supports a finding that [d]efendant had joint access or control over the room, and thus had actual authority to consent."); United States v. Clark, 234 F.Supp.2d 471, 476-77 (D.N.J. 2002) (third-party had actual authority to consent to search of hotel room where he stayed overnight despite not being a registered guest).

Lieutenant Cantrell testified at trial that, after seeing the Defendant standing on the tubing, he expressed his concern that there was "either a meth lab or meth lab components in" the hotel room. According to Lieutenant Cantrell, the Defendant then stated that "there was not anything illegal in the hotel room" and gave consent to search the room. Furthermore, Lieutenant Cantrell testified that the Defendant admitted he was romantically involved with the co-defendant and that they had been staying in the hotel room for approximately two weeks. Moreover, despite the Defendant's assertion to the contrary on appeal, Lieutenant Cantrell did not testify at trial that he attempted to obtain consent to search from the co-defendant, but Lieutenant Cantrell, instead, stated that he did not ask the co-defendant for consent to search the room because she "had kind of become argumentative" and "uncooperative." We conclude that the trial testimony established that the Defendant had actual authority over the hotel room. Even if the Defendant did not, Lieutenant Cantrell was allowed into Room 118 by the Defendant, and there were no signals undermining a belief that the Defendant had the authority to

consent to a search of the motel room, so he had apparent authority. See Rodriguez, 497 U.S. at 188. The Defendant gave valid consent to the warrantless search.

Additionally, if the Defendant did not possess common authority over the hotel room as he suggests, then he has no standing to challenge the search. One who does not have such an expectation of privacy lacks "standing" to challenge the search. See State v. Patterson, 966 S.W.2d 435, 441 n.5 (Tenn. Crim. App. 1997). If the defendant had no authority to consent, he likewise had no standing to challenge the intrusion having been made by the authorities. See, e.g., State v. Charles Ray Harvey, No. E2006-00882-CCA-R3-CD, 2008 WL 565715, at *14 (Tenn. Crim. App. Mar. 4, 2008) (citing State v. Oody, 823 S.W.2d 554 (Tenn. Crim. App. 1991) ("The fallacy of this position is that if the defendant had no right to make the intrusion, he likewise had no standing to challenge the intrusion having been made by the authorities."). Thus, the Defendant's challenge to the admission of the evidence found in the hotel room is without merit.

## II. *Sufficiency of the Evidence*

The Defendant also argues that the evidence was insufficient to support his conviction for promoting the manufacture of methamphetamine. Specifically, the Defendant complains:

> The only evidence that [the Defendant] promoted the manufacture of methamphetamine and didn't merely reap the fruits of an earlier methamphetamine cook at a different location is that he claimed to have found some of the items, already used, outside the hotel room and brought them in, and even that evidence requires picking apart the statement and constructing a new meaning from a few of the pieces.

He notes that he was one of three people found in the room, that the items in the room were not enough to produce methamphetamine, and that the items recovered "in the hotel room likely were used at some point to manufacture methamphetamine" in the past. The State counters that the evidence was sufficient.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness

credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The standard of proof is the same whether the evidence is direct or circumstantial.  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).  Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence."  Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State."  State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

As relevant here, an individual is guilty of promoting methamphetamine manufacture if he or she "[s]ells, purchases, acquires, or delivers any chemical, drug, ingredient, or apparatus that can be used to produce methamphetamine, knowing that it will be used to produce methamphetamine, or with reckless disregard of its intended use[.]"  Tenn. Code Ann. § 39-17-433(a)(1).  Manufacture "means the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis[.]"  Tenn. Code Ann. § 39-17-402(15).

Initially, we note that, in his appellate brief, the Defendant, quoting to State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995), submits that "[t]he trier of fact . . . must be able to 'determine from the proof that all other reasonable theories except that of guilt are excluded.'"  This was the standard of review enunciated by our supreme court in State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971), which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt."  However, our supreme court expressly overruled this standard for circumstantial evidence over seven years ago in Dorantes, holding that circumstantial evidence is as probative as direct evidence.  331 S.W.3d at 379-81.

Next, viewed in the light most favorable to the State, the proof adduced at trial showed that the Defendant was in a relationship with his co-defendant and that they had been sharing a room at the Scottish Inn in McMinnville for approximately two weeks when Lieutenant Cantrell arrived on the morning of March 24, 2016, to serve an outstanding "child support warrant" on the co-defendant.  After Lieutenant Cantrell knocked on the hotel room door, he heard about ten to fifteen seconds of "rummaging

-10-

around inside the room," which he described as "sound[ing] like people were rushing around" and moving "different things."

Later, once Lieutenant Cantrell was inside the hotel room and was in the process of arresting the co-defendant, he noticed that the Defendant was standing on a six-foot section of tubing. The Defendant gave consent to search the room, and in addition to the tubing, the officers found acetone in the refrigerator, three glass jars "close to one of the beds," and twenty-five coffee filters "hidden in a corner underneath some clothing." The tubing was "dirty" like it had been "used in the gassing off process." According to Lieutenant Cantrell, the tubing, acetone, glass jars, and coffee filters were all used in the manufacturing process. Lieutenant Cantrell acknowledged that some of the inventoried items were "common household items," but he opined that they were found "in odd places" in the hotel room.

Moreover, one of the glass jars had white residue on it, which field-tested positive for methamphetamine. Lieutenant Cantrell maintained that the white residue on the glass jar was consistent with methamphetamine manufacturing using the one-pot or shake-and-bake method. In addition, the white residue was still wet indicating to Lieutenant Cantrell that it had been manufactured within the last twenty-four hours. Lieutenant Cantrell opined that "this [was] a meth lab either that ha[d] been used or [would] be used" to manufacture. Deputy Crouch also testified that, based upon his experience, the items found in the hotel room that he "took and disposed of" were "components used in the manufacture of methamphetamine." Deputy Crouch averred that a cook had occurred within a few "hours to days."

In addition, the officers found multiple items of paraphernalia in the room that were "associated with use of meth," and two bags of methamphetamine in its rock-like form, which weighed approximately 0.59 grams in total. The Defendant admitted that he was addicted to methamphetamine. Both Deputy Crouch and Lieutenant Cantrell acknowledged that not all of the components in the manufacturing process were present inside the hotel. However, Lieutenant Cantrell explained that was why he charged them with promotion rather than initiation.

Finally, the Defendant claimed possession of certain items when speaking with Lieutenant Cantrell after being given his Miranda warnings. The Defendant "stated that he found the glass jars, the tubing, and the acetone in a garbage bag in the parking lot of the hotel and [that] he brought them into his room because he's an addict." On appeal, the Defendant argues that "the evidence requires picking apart" his statement to Lieutenant Cantrell and "constructing a new meaning from a few pieces." We do not think the Defendant's statement necessitates such an interpretation. Regardless, possession may be actual or constructive. See State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). Lieutenant Cantrell testified that he did not believe the co-defendant when she

-11-

professed sole possession of the items because the Defendant had been present in the hotel room with her for two weeks and it was unlikely he "had no knowledge or no part of it." The jury was entitled to reach the same conclusion.

In addition, the fact that Ms. Evagues was released does not abate the Defendant's guilt. Likewise, the State was not required to prove that the prior cook had taken place in the hotel room, although there was certainly sufficient circumstantial evidence that it had.

Upon our review, we conclude that the evidence was sufficient for a jury to find beyond a reasonable doubt that the Defendant acquired materials used to produce methamphetamine knowing that they would be used to manufacture methamphetamine or with reckless disregard of their intended use. See, e.g., State v. Michael Shane McCullough, No. W2017-01219-CCA-R3-CD, 2018 WL 2148451, at *3-4 (Tenn. Crim. App. May 9, 2018) (finding that the evidence was sufficient to support the defendant's promotion of methamphetamine manufacturing conviction where the deputy witnessed the defendant throw something into a ditch and, a few minutes later, located a plastic bag filled with crushed ephedrine in the ditch, reasoning that "it was not even necessary that the proof show [the d]efendant had actual possession of the drug precursors at the time of his arrest or be actually witnessed initiating the process"); State v. Donnie Dewayne Davenport, No. E2014-02545-CCA-R3-CD, 2015 WL 5925118, at *4 (Tenn. Crim. App. Oct. 12, 2015) (holding that the evidence was sufficient to support promotion of methamphetamine manufacture conviction where deputies responded to a call of someone cooking methamphetamine, and the deputies agreed that the defendant was in possession of all but two of the necessary ingredients for the one-pot method). Accordingly, the Defendant is not entitled to relief on this issue.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-12-