RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0092p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-5640

ROBERT R. CALDWELL,

*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 04-00070—David L. Bunning, District Judge.

Argued: February 7, 2008

Decided and Filed: February 26, 2008

Before: SUHRHEINRICH, SUTTON, and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** Paul J. Neel, Jr., Louisville, Kentucky, for Appellant. David P. Grise, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Paul J. Neel, Jr., Louisville, Kentucky, for Appellant. David P. Grise, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. Robert Caldwell challenges the district court's denial of his motion to suppress evidence uncovered during a search of his hotel room (consented to by a co-occupant of the room) as well as its denial of his motions for a mistrial and acquittal. Because the district court did not err in denying any of these motions, we affirm.

I.

On June 9, 2004, Caldwell and Kelly Meyer checked into the Extended Stay Hotel in Covington, Kentucky. Caldwell paid for the room in cash and provided the hotel a copy of his state identification card. Caldwell signed in as "Guest 1," and Meyer, using the alias "Pahree Caldwell," signed in as "Guest 2."

1

Shortly after 2:00 p.m. that day, Andy Muse, an agent in the Northern Kentucky Drug Strike Force, received a call from the hotel manager, who reported a marijuana odor coming from room 412, the room registered to Caldwell and Meyer. The manager faxed the room registration form to Muse, who ran the names through the police database to check for outstanding warrants. Caldwell, it turned out, had an outstanding warrant for aggravated burglary.

Upon arriving at the hotel, Muse spoke with the desk clerk, who offered a description of Caldwell and Meyer. Less than one hour later, Muse and other agents observed a male and female exit room 412. As the couple attempted to exit the hotel parking lot in Caldwell's car, police cruisers stopped the car. At this point, as the district court noted, "the testimony varies dramatically."

According to the agents: they removed Caldwell from the vehicle, confirmed his identification and arrested him in connection with his outstanding warrant. An agent frisked Caldwell and discovered 13 "baggies" of marijuana in Caldwell's right rear pocket. After finding the marijuana, the agents asked Caldwell for consent to search his hotel room. "I don't know anything about that," Caldwell responded. "You'll have to ask [Meyer]. It's her room." The agents asked Meyer whether the room belonged to her; she said it did. Claiming her real name was "Dawn Scherer," Meyer acknowledged being a guest in the room and acknowledged registering under the name Pahree Caldwell. After receiving oral consent to search the room, the officers asked Meyer to sign a consent form, which she did, under the heading of "Dawn C. Scherer AKA: Pahree A. Caldwell." Caldwell was present in the parking lot during the entire exchange, including when Meyer signed the consent form, and expressed no objection to the search.

Caldwell tells a different story. According to him: the officers stopped his car, drew their guns, pulled him out, "slammed" him to the ground and handcuffed him. The officers searched him and discovered a driver's license, $182 in cash, a cell phone, a hotel key card and a debit card—but no drugs. Caldwell denied possessing any marijuana at the time of the search. The officers asked Caldwell if they could search his room, but he made it "real clear" to them that if they did not have a search warrant they could not search the room. Caldwell denied being present when the officers questioned Meyer.

The parties give largely similar accounts of what happened next. While the officers could not remember how they entered room 412—whether they used Meyer's key, whether they used the room key seized from Caldwell or whether the hotel manager let them in—they eventually searched the room. Once in the room, the officers discovered—in a white paper bag on the bed and in an unzipped CD case on the floor next to the bed—five bags of marijuana, a bag of crack cocaine, a digital scale, two boxes of ammunition and two handguns. All told, the officers seized just under 3 grams of crack cocaine and 212 grams of marijuana. At some point during the search, Meyer volunteered her legal name and social security number.

A grand jury indicted Caldwell for possession with intent to distribute crack cocaine, *see* 21 U.S.C. § 841(a)(1), possession with intent to distribute marijuana, *see id*., and possession of a firearm in furtherance of a drug trafficking crime, *see* 18 U.S.C. § 924(c). A jury found Caldwell guilty on all counts, and the judge sentenced him to 120 months.

II.

Caldwell presses three arguments on appeal: (1) the search of his hotel room violated his Fourth Amendment rights; (2) several statements made by the government in front of the jury denied him a fair trial; and (3) the evidence does not support the verdict.

A.

Under the Fourth Amendment, an occupant of a hotel room has a reasonable expectation of privacy there, even though he is just a guest, not an owner, of the room. *See Stoner v. California*, 376 U.S. 483, 490 (1964); *see also Minnesota v. Olson*, 495 U.S. 91, 98–99 (1990). That makes a warrantless search of a hotel room unreasonable unless it falls within an exception to the warrant requirement. One such exception is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

The question here is: how does the consent doctrine work when the room has two occupants, one of them consents and the other is silent? So long as the consenting individual has actual common authority over the room, *United States v. Matlock*, 415 U.S. 164, 170–71 (1974), or apparent common authority over the room, *Illinois v. Rodriguez*, 497 U.S. 177, 181, 186 (1990), officers may rely on the consent of one of the occupants in this setting. "Common authority," the Supreme Court tells us, refers to the "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Matlock*, 415 U.S. at 171 n.7; *see also Georgia v. Randolph*, 547 U.S. 103, 110 (2006).

The district court properly applied these principles in rejecting Caldwell's suppression motion. When Meyer permitted the officers to enter the hotel room, she clearly had authority to do so: Meyer had checked into the room with Caldwell; she had signed into the room as a registered guest; she had placed her luggage and personal belongings in the room; she had spent approximately the same amount of time in the room as Caldwell had; she exited the room with him immediately before the search; and she intended to stay there overnight. These facts confirm that Meyer had sufficient control over the room to permit the officers to search it.

Caldwell's primary response is that the record is silent as to whether Meyer had a room key at the time she consented to the search, precluding the conclusion she had actual authority over the room. But the presence or absence of a room key is not the be-all of actual authority, as anyone who has ever misplaced a room key knows. The issue is not whether she had a room key at the time of the search; the issue is whether she had authority to get one. Because she was registered as "Guest 2," because her possessions were there and because she was staying there for the night, she assuredly had authority to enter the room—even if it meant asking the hotel clerk to let her in or to make a new key. Just as a tenant assumes the risk that a co-tenant might get a spare key from the landlord and admit an unwanted person, a hotel guest assumes the risk that his roommate might obtain a key from the hotel manager and do the same. *See Matlock*, 415 U.S. at 171 n.7 (noting that, when individuals enter a co-occupant relationship, they "assume the risk that one of their number might permit [a] common area to be searched").

If this fact pattern sounds familiar, that is because it is. Less than two years ago, in *United States v. Beasley*, 199 F. App'x 418 (6th Cir. Sept. 26, 2006), we had the opportunity to address the validity of a similar search, one involving the same drug task force, the same investigating officer, the same town, the same hotel. In that unpublished decision, we upheld the warrantless search of a hotel room based on one co-occupant's consent, reasoning that co-occupants of a hotel room "understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." *Id*. at 425 (internal quotation marks omitted). And because it is "well-established that a third-party can consent to a search of jointly occupied property, as long as the third-party has 'common authority' over the premises," we held it uncontroversial that a co-occupant could validly consent to a search of the co-occupied hotel room. *Id*. at 424 (internal quotation marks omitted). The same is true here.

Invoking *Randolph*, 547 U.S. 103, Caldwell argues that Meyer lacked the authority to consent to the search of the room over his objection. While the legal premise of this argument may be correct in view of *Randolph*, the factual premise is not. Faced with conflicting testimony over whether Caldwell objected to the search (Caldwell said yes, Agent Muse said no), the district court determined that Caldwell's "testimony [was] not believable" and "detract[ed] from [his] overall credibility" and accordingly accepted Muse's version of events. Because Caldwell's testimony was implausible in at least one instance (*i.e.*, he denied carrying drugs even though considerable evidence showed he had thirteen baggies of marijuana in his pocket), the district court did not clearly err in crediting Muse's account.

Caldwell separately argues that, even if the officers permissibly entered the room, Meyer did not (and could not) consent to the search of two of *his* containers—a white paper "LaRosa's Pizzeria" bag and an unzipped, partially opened CD case. Caldwell did not raise this argument below. While there is some debate over whether we should treat a suppression argument raised for the first time on appeal as a waiver (subject to review only if the defendant can show "good cause," Fed. R. Crim. P. 12(e)) or a forfeiture (subject to "plain error" review, Fed. R. Crim. P. 52(b)), *compare United States v. Bonds*, 12 F.3d 540, 569 (6th Cir. 1993), *with United States v. Buchanon*, 72 F.3d 1217, 1226–27 (6th Cir. 1995), we need not enter this thicket because Caldwell cannot meet his burden in either event.

The key problem is that, even if Caldwell could establish that the district court erred in admitting this evidence, there was nothing "plain," "clear" or "obvious" about the error. *United States v. Olano*, 507 U.S. 725, 734 (1993). Consent to search an area normally includes the containers within that area. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991). That is particularly true of partially opened (and thus less private) containers—such as a paper bag and an unzipped CD case. The scope of a search, moreover, is "generally defined by its expressed object," *id.*, and Meyer unquestionably permitted the officers to search her belongings *for drugs*—and certainly these were the kinds of places where such items could be found. Keep in mind as well what Caldwell had told the officers—that the room belonged to Meyer and that all of his belongings remained in the car outside the hotel. In the final analysis, because Caldwell denied any ownership of these items and because "[a] reasonable person may be expected to know that narcotics are generally carried in some form of a container" and "rarely are strewn across the . . . floor," *id.* (internal quotation marks omitted), a reasonable search for narcotics in a hotel room—even where the consenting individual said she had just one piece of luggage—might well extend to cover a nearby white paper fast-food bag and an open CD case.

Caldwell, at all events, has not pointed to any clear authority going the other way, and of course the government had no incentive to develop the factual record on the issue (because Caldwell did not raise this theory below)—making it difficult to conclude that this is the kind of error, if indeed it was an error at all, that we may correct at this stage of the case and in this kind of posture. *See Sykes v. United States*, 373 F.2d 607, 613 (5th Cir. 1966) ("That which is not visible cannot be plain.") (internal quotation marks omitted); 6 Wayne R. LaFave, Search and Seizure § 11.7(e) (4th ed. 2004) ("[A]nother good reason why appellate courts ordinarily do not and should not use the plain error rule to reach Fourth Amendment claims [is that to] do so often would penalize the Government for failing to introduce evidence on . . . matters bearing on the Fourth Amendment claim[] when defendant's failure to raise an objection before or during trial seemed to make such a showing unnecessary.") (internal quotation marks omitted).

## B.

The district court also did not commit reversible error in denying Caldwell's motion for a mistrial. Before trial, the court ruled that the government could not introduce evidence concerning the charge that formed the basis for Caldwell's arrest. Nonetheless: (1) the AUSA, Robert

McBride, in his opening statement, said "Muse ran [Caldwell's name] through the computer, and it popped up as positive for an arrest warrant for an aggravated burglary"; (2) Ken Holstein, a Covington, Kentucky, police sergeant, testified that he became involved in the case when asked for assistance "in the possible apprehension of a man who was wanted for robbery"; and (3) Matthew Duane Rolfson, an officer in the Northern Kentucky Drug Strike Force, testified that he "remember[ed] having a conversation with Mr. Caldwell on the phone. It was a collect call from jail."

In response, the government disclaims knowing about the court's order, saying in its appellate brief that the court issued the order "at a sidebar, outside the prosecutor's presence." The record does not confirm this explanation one way or another, and it of course assumes (oddly) that the AUSA permitted Caldwell to obtain the ruling on an ex parte basis. Whether the AUSA understood the ruling before his opening statement, however, he surely knew about it once the trial judge admonished him, and yet at least one of his witnesses again let the cat out of the bag later in the trial. On this record, we will assume without deciding that the first two statements were improper. (The third statement is less troubling because it less clearly violates the court's ruling and because the record seems to indicate that Caldwell opened the door to, and indeed may have invited, the statement.)

The question then is whether the trial judge, who presided over the trial and whose pre-trial ruling was violated, exceeded his considerable discretion in denying Caldwell's motion for a mistrial. *See United States v. Humphrey*, 279 F.3d 372, 376 (6th Cir. 2002). In each instance, Caldwell objected to the introduction of these statements and in each instance the court instructed the jury to disregard the statement. *See Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003). While there is room for debate over whether these kinds of instructions remove the sting from the improper statement or make it swell, the fact remains that no one had a better perch from which to assess the point than the trial judge, who obviously felt sufficiently comfortable with this approach and with the jury's capacity to adhere to the instruction that he denied Caldwell's motion for a mistrial.

Two things make us comfortable with this ruling—the deference we traditionally give to trial judges over this kind of context-based and judgment-based decision, *see Humphrey*, 279 F.3d at 376, and the considerable evidence the government (properly) introduced against Caldwell. Testimony showed that Caldwell had marijuana, bagged and ready for sale, on his person, that he had more empty bags in his car and that he had digital scales, more drugs, ammunition and two guns (one loaded) in a hotel room that he had rented and paid for—in cash, no less. Against the backdrop of this considerable evidence of guilt, the risk that two of these statements (or even all three) could have swayed the jury is slim.

Nor can we say that the government's mistakes showed bad faith or otherwise represented a pattern. *See Zuern*, 336 F.3d at 485. The prosecutor referred to the aggravated burglary once, and he did not repeat the mistake after being admonished. Nothing about the officers' statements, moreover, suggests that they were intentionally elicited by the prosecutor. To the contrary, they grew out of a reasonable line of questioning. The district court in the final analysis did not abuse its discretion in denying the motion for a mistrial.

## C.

In arguing that the district court should have granted his motion for acquittal, Caldwell points out that the "illegal contraband could have belonged to" Meyer. True enough, and of course Caldwell was free to argue (and the jury free to find) that the contraband indeed belonged to his girlfriend, not to him. But, as the verdict confirms, the jury made no such finding. Because we must draw all reasonable inferences in favor of the government and because the jury readily and

reasonably could infer that the contraband belonged to Caldwell (or to both Caldwell and Meyer), this contention is unavailing.

III.

For these reasons, we affirm.