**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0273n.06

Case No. 14-6459

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
May 18, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| JAMES J. EASTMAN, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BOGGS, WHITE, and DONALD, Circuit Judges.

BOGGS, Circuit Judge. Defendant James Eastman was convicted by a jury on a ten-count indictment in connection with a loan-office robbery, a bank robbery, and two carjackings. On appeal, Eastman raises several issues regarding the denial of his motion to suppress evidence obtained from the motel room where he was apprehended, the testimony of the Government's DNA expert, the sufficiency of the evidence, and the reasonableness of his sentence. Each of these arguments is without merit. We affirm.

I

Eastman was a target in the investigation of several crimes committed in Chattanooga in late May and early June 2012, which law enforcement believed were related. First, a man wearing a yellow construction hat and dust mask (both recovered from a nearby dumpster) robbed a loan office with a handgun. The next week, a man wearing a blue hat that appeared to

resemble a Smurf or Cookie Monster, latex gloves, and a dust mask robbed a nearby bank. Three days later, a man wearing a similar hat and mask stole a Jeep Cherokee by threatening its owner with a handgun. Local police spotted a man driving the Jeep while wearing yellow dishwashing gloves the next day. When they stopped the Jeep, the driver ran from the vehicle, dropped the gloves, and disappeared over a fence. Among the items recovered from the Jeep were a dust mask, a hat with Smurf branding, and three firearms (two belonging to the Jeep owner). Later the same day, a man wearing a dust mask and wielding a handgun stole a Dodge Dakota.

Within an hour, a team of FBI agents and Chattanooga police located the Dodge in a motel parking lot. They investigated further and identified a lead. Earlier that day, Keosha Kellogg (a known associate of Eastman's) had rented a room at a motel across the street from where the Dodge was found. At first, the officers tried to coax the room's occupant into the hallway with the fabricated threat of a gas leak. When they knocked and advised of the leak, Eastman briefly opened and then quickly shut the door. The officers then used the motel manager's keycard to enter the room and ordered Eastman to lay down and place his hands behind his back. Eastman did not comply. The officers were able to handcuff Eastman after tasing him twice. They then led him to the motel lobby where paramedics were present. An officer testified that in the motel lobby, Eastman "was asked about the room in question and denied ownership" of it.

The officers decided to conduct a more thorough search of the room. So they went to Kellogg's home where she acknowledged that she had rented the room and consented to its search. The search uncovered a bank brochure, a loaded .32-caliber revolver, a dust mask, yellow rubber gloves, and a key to Eastman's apartment. Law enforcement also obtained

warrants and searched two residences. At Eastman's apartment, they found an empty gun box and two construction hats. At a house near where the Jeep was stopped, they recovered a wallet with Eastman's driver's license, yellow dishwashing gloves, a box of latex gloves, and sweatpants bearing similarities to those worn by the bank robber.

Eastman was indicted on ten counts: two counts for the loan-office and bank robberies, 18 U.S.C. §§ 1951, 2113; two counts for the carjackings, *id.* § 2119; four counts for using a firearm to further those crimes, *id.* § 924(c); and two counts for possessing a firearm as a felon, *id.* § 922(g). He moved to suppress evidence seized from the motel room, arguing that he was not asked for consent to search the room and that Kellogg, who was absent from the room and did not have a key to it, lacked the authority to consent.

At the continued suppression hearing, Kellogg testified that Eastman asked her to rent the room for him and reimbursed her for the cost. She had spent less than an hour in the room that day, but planned to return in the evening to see Eastman and possibly to spend the night. Although Kellogg claimed not to remember having consented to the search, an officer testified that she had consented, and Kellogg admitted that she would have had no reason to deny consent. The magistrate judge recommended denying the motion on the basis that Kellogg knowingly and voluntarily gave her consent to search the motel room. The district court adopted the recommendation, finding that Kellogg had the authority to consent and had done so voluntarily.

The case went to trial and a jury convicted Eastman on all counts. The government's case included expert testimony from an FBI forensic DNA examiner. He testified that he had tested several items for Eastman's DNA, including the construction hat and dust mask found in the loan-office dumpster, the firearms and dust mask found in the Jeep, the yellow dishwashing gloves discarded by the Jeep driver, and the dust mask and firearm from the motel room. The

examiner testified that he had detected a "dominant DNA" that matched Eastman's on the three dust masks. Based on those results, he calculated a "random match probability" of one in three-hundred-fifty-four trillion and concluded with "a reasonable degree of scientific certainty" that Eastman's DNA was present on the masks. The examiner also testified that he did not know the error rate for DNA testing because no standard accepted approach for calculating such an error rate exists.

Based on Eastman's offenses of conviction and his status as a career offender, Eastman's recommended sentencing range under the Sentencing Guidelines was from 1344 months up to life plus 984 months of imprisonment. The district court sentenced Eastman at the bottom of the range recommended by the Guidelines.

II

On appeal, Eastman presses four arguments: (1) the search of the motel room violated his Fourth Amendment rights, (2) the testimony of the DNA analyst was unreliable, (3) the evidence does not support the verdict, and (4) his sentence was unreasonable.

A

Eastman asserts that the district court should have granted his motion to suppress evidence obtained from the motel room because Kellogg did not have the authority to consent to its search. When considering the denial of a motion to suppress, we review a district court's factual findings for clear error and its legal conclusions de novo. *United States v. Levenderis*, 806 F.3d 390, 399 (6th Cir. 2015). For a factual finding to be clearly erroneous, the reviewing court must have a "definite and firm conviction" that a mistake was made. *United States v. Seymour*, 739 F.3d 923, 928 (6th Cir. 2014). We must view the evidence in the light most likely

to support the district court's decision. *United States v. Evans*, 581 F.3d 333, 340 (6th Cir. 2009).

To claim the protections of the Fourth Amendment, a defendant must have "a legitimate expectation of privacy in the invaded space." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The occupant of a motel room generally has a reasonable expectation of privacy. *See Minnesota v. Olson*, 495 U.S. 91, 99 (1990).

Neither Eastman nor the Government argues that Eastman's denial that the motel room was his negated any legitimate expectation of privacy. Yet a person who voluntarily abandons property in the absence of an unconstitutional seizure has no legitimate expectation of privacy in it, and therefore its search or seizure does not violate *his* Fourth Amendment rights. *See United States v. Robinson*, 390 F.3d 853, 873–74 (6th Cir. 2004); *United States v. Frazier*, 936 F.2d 262, 265 (6th Cir. 1991). As with a package, *United States v. Knox*, 839 F.2d 285, 294 (6th Cir. 1988), bag, *Frazier*, 936 F.2d at 265, or luggage, *United States v. Tolbert*, 692 F.2d 1041, 1044–45 (6th Cir. 1982), in at least some circumstances, denial of ownership can also divest a person of a justified expectation of privacy in a rented room. When asked about the motel room in which he had just been apprehended, Eastman disclaimed any connection to it. And, although he challenged the validity of that disclaimer below, he does not address the issue on appeal. Thus, our analysis proceeds on the basis that Eastman abandoned any privacy interest in the room. We do not address the potentially difficult question of whether someone voluntarily abandons a motel room shortly after being tased twice and then handcuffed.

Would having sought a warrant here been better police practice? Perhaps. A valid warrant would have made the search practically impregnable. Yet searches without a warrant are permitted, the Fourth Amendment prohibiting only "unreasonable searches and seizures." U.S.

Const. amend. IV. It does not demand "best practices []or formulaic adherence to one search method over another." *United States v. Walker*, 615 F.3d 728, 732 (6th Cir. 2010). Consent—a "specifically established exception[] to the requirements of both a warrant and probable cause," *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)—is constitutionally sufficient.

Kellogg acted within her authority to consent. A third party may permit a search of premises over which she possesses "common authority"—that is, "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974).

We recently had occasion to opine on the power of a third-party to consent to the search of a hotel room when the defendant co-occupant is silent. In *United States v. Caldwell*, we held that a person who had checked into the room with Caldwell, signed into the room as a registered guest, placed her luggage and personal belongings in the room, spent approximately the same amount of time in the room as Caldwell, left the room with him immediately before the search, and intended to stay there overnight had sufficient control over the room to consent to its search. 518 F.3d 426, 429 (6th Cir. 2008).

Here, Kellogg had, at a minimum, mutual use of the hotel room sufficient to consent to its search. She paid for the room with her debit card, spent time there earlier in the day, and planned to return in the evening, perhaps to spend the night. Eastman responds that Kellogg had no room key, but as in *Caldwell*, "[t]he issue is not whether she had a room key at the time of the search; the issue is whether she had authority to get one," 518 F.3d at 429. Kellogg clearly had that authority since hers was the only name on the hotel register—a strong indication of her

authority to access and use the room. *See ibid.* Based on these facts, Kellogg had sufficient control over the room to permit officers to search it.

Invoking *Georgia v. Randolph*, Eastman argues that "'a physically present co-occupant's stated refusal to permit entry'" renders a "'warrantless search unreasonable and invalid as to him.'" Appellant Br. at 9 (quoting 547 U.S. 103, 106 (2006)). True enough, but irrelevant here. The district court found—and Eastman does not dispute—that instead of refusing consent to search the room, he denied that it was his. His actions are hardly comparable to those of the physically present co-occupant in *Randolph* who "unequivocally refused" permission to search a residence. *Randolph*, 547 U.S. at 107.

More on point is *Fernandez v. California*, 134 S. Ct. 1126 (2014). *Randolph*'s "narrow exception" to the general rule that "consent by one resident of jointly occupied premises is . . . sufficient," the Court held, is inapposite when the objector is absent due to a lawful detention. *Id.* at 1133, 1134–35. Eastman's argument has even less of a footing in *Randolph* than that of the co-occupant in *Fernandez* who at least objected to the search prior to arrest. *See id.* at 1134. No Fourth Amendment remedy is available when a defendant with a later asserted interest in property disclaims ownership of it and a third party with common authority consents to its search.

B

Eastman next argues that the district court erred by admitting the testimony of the Government's DNA analyst. We review for abuse of discretion. *United States v. Stepp*, 680 F.3d 651, 660 (6th Cir. 2012). Accordingly, we will overturn a ruling only when "left with the definite and firm conviction" of a clear error of judgment, an improper application of the law, or the use of an erroneous legal standard. *Ibid.*

A qualified expert may give opinion testimony that is relevant, reliable, and the product of generally accepted principles and methods that have been reliably applied. Fed. R. Evid. 702; *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The reliability inquiry focuses on the "principles and methodology" that underlie the evidence. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993). Relevant factors include "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001).

Eastman's grievance is with the reliability of DNA evidence in general. The expert testified that polymerase chain reaction (PCR)—the process used to identify Eastman as the likely major DNA profile found on three dust masks—has no known error rate or accepted procedure for determining an error rate. By Eastman's logic, the expert's testimony (and all such DNA evidence) was therefore inadmissible. This argument confuses the error-rate *factor* with an admissibility *requirement*. More than ten years ago, we noted that "[t]he use of nuclear DNA analysis as a forensic tool has been found to be scientifically reliable by the scientific community for more than a decade." *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004). Eastman presents no groundbreaking evidence that leads us to question that decision. At least one of our sister circuits even permits trial courts to take judicial notice of PCR's reliability. *See United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996). Of course, a defendant may challenge sound scientific methodology by showing that its reliability is undermined by procedural error— failure to follow protocol, mishandling of samples, and so on. But Eastman did not do so here. We therefore hold that the district court did not abuse its discretion by admitting the expert testimony.

C

Eastman also questions the sufficiency of the evidence supporting his convictions. In so doing, he "bears a very heavy burden." *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) (citation omitted). We "view[] the evidence in the light most favorable to the prosecution" and "giv[e] the government the benefit of all inferences that could reasonably be drawn from the testimony." *United States v. Jones*, 641 F.3d 706, 710 (6th Cir. 2011) (quoting *United States v. Ross*, 502 F.3d 521, 529 (6th Cir. 2007)). We then ask whether "any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *Ibid.*

Here are the absolving facts as Eastman sees them: One witness described the bank robber as slightly older, heavier, and taller than Eastman is; an alibi witness estimated that Eastman had been in her office around the time of the bank robbery; and the mother of Eastman's child testified that she had been with him before the bank robbery occurred. Even if it had taken that evidence on faith, the jury was presented over a four-day trial with more than enough for a rational trier of fact to convict Eastman. Besides the DNA and physical evidence connecting Eastman to the carjackings and robberies, Eastman's build was consistent with another witness's description of the bank robber, clothing matching the bank robber's was found in the apartment along with Eastman's driver's license, and the alibi witness acknowledged that her two-year-old memory of the time that morning was an estimate. A rational jury could have credited or discredited all or part of the testimony of the alibi witness and the mother of Eastman's child, especially since it was presented with ample evidence to the contrary. We conclude that Eastman was convicted on sufficient evidence.

D

Finally, Eastman argues that his within-Guidelines sentence was substantively unreasonable. We review for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008). However, we apply a rebuttable presumption of reasonableness to within-Guidelines sentences. *United States v. Vonner*, 516 F.3d 382, 389–90 (6th Cir. 2008) (en banc).

On appeal, Eastman argues that the nature of his crimes makes his sentence of 1344 months of imprisonment greater than necessary to comply with 18 U.S.C. § 3553(a)(2). In imposing its sentence, the district court stated that it had considered Eastman's arguments in light of the § 3553(a) sentencing factors. The court reasonably explained that its decision to sentence Eastman at the bottom of the Guidelines-recommended range was based on the career-offender mandatory minimum, "the nature and facts of the offense," and "to protect the public from further crimes of the defendant, to afford adequate deterrence to this type of criminal behavior, to provide just punishment for the offense, to promote respect for the law, and to reflect the seriousness of the offense." Under these circumstances, Eastman has not rebutted the presumption that his within-Guidelines sentence is substantively reasonable.

III

Based on the foregoing, we AFFIRM the district court's judgment and sentence.