RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DWAYNE ELLIS ROBINSON, JR.,

*Defendant-Appellant*.

┐
│
│
> No. 23-5486
│
│
┘

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:22-cr-00035-1—Aleta Arthur Trauger, District Judge.

Argued: October 29, 2024

Decided and Filed: April 7, 2025

Before: STRANCH, THAPAR, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Molly Rose Green, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Rachel M. Stephens, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Dumaka S. Shabazz, Michael C. Holley, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Rachel M. Stephens, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge. A jury convicted Dwayne Robinson of unlawfully possessing a firearm as a felon. A district court imposed the Armed Career Criminal Act's minimum punishment because it found that Robinson had previously committed three qualifying offenses

on "occasions different from one another[.]"  18 U.S.C. § 924(e)(1).  Robinson now raises four claims.  He argues that the district court violated the Sixth Amendment by responding to a jury note without his counsel's input.  He argues that the court should have granted a mistrial after detectives implied that he had shot at someone.  He argues that the jury instructions incorrectly told the jury that gun ownership is irrelevant to gun possession.  Finally, he argues that the district court could not invoke the Armed Career Criminal Act because the court did not require the jury to resolve whether he had committed his prior offenses on different occasions.

None of these arguments provides a basis for relief.  Robinson did not properly object to the court's response to the jury note, its failure to grant a mistrial, or its jury instructions.  We thus review these challenges for plain error.  Robinson also has not shown that the district court committed an obvious mistake on any of these issues.  As for his sentencing challenge, intervening Supreme Court precedent has confirmed Robinson's claim that the jury should have decided whether he committed his prior offenses on different occasions.  But our court's intervening precedent has made clear that this type of error can be harmless.  And a gap of many years separated each of Robinson's three crimes.  The record thus leaves no doubt that he committed those crimes on different occasions and that this error was harmless here.  We affirm.

I

In the summer of 2021, Robinson came to the attention of the "TITANS" unit of the Metro-Nashville Police Department in Nashville, Tennessee.  This unit investigated neighborhood shootings and suspected Robinson of a potential homicide.  Robinson also had a warrant out for his arrest.

On August 6, some of the unit's detectives were looking for Robinson by surveilling his mother's home.  They observed Robinson arrive at the home in a Hyundai Elantra.  He left and drove off in the Elantra a short time later.  The detectives followed Robinson in their own cars.  They also kept track of his movements with the aid of the police department's aviation unit.

Robinson drove to a church and went inside.  As other members of the TITANS unit arrived on the scene, a detective quickly looked into the parked Elantra and saw nobody else in the car.  A heavy tint covered the car's back windows, though, so she did not get a good look at

the back seats.  The detectives then announced their presence and ordered Robinson to come out of the church.  Other men opened the front door, and the detectives spotted Robinson standing near the entrance.  They took him into custody without incident.

As the detectives walked Robinson out, the Elantra's brake lights suddenly "came on." Rench Tr., R.88, PageID 529.  The lights alerted the detectives that another person was in the car.  Shakendra Boggs, Robinson's cousin and the Elantra's owner, had climbed into the driver's seat during the arrest.  The detectives worried that Boggs might drive off or, worse, run them over.  So they ordered her to exit.  She refused to comply.  Boggs eventually opened the driver's side door, and the detectives pulled her out.  She asked them to check on her baby, who was secured in a car seat in the back.  When leaning into the car to observe the child, a detective spotted "two firearms on the floor underneath the front passenger seat." *Id.*, PageID 532, 549.  A revolver "was just kind of sitting there," and the other firearm was partially covered by a cloth. *Id.*, PageID 532–33.

After the detectives arrested Robinson, they took him to police headquarters for questioning.  Robinson and Boggs could not possess the discovered firearms because they both had prior felony convictions.  An investigator told Robinson that the officers would "have to charge everybody [who had been] in the vicinity" of the weapons (including Boggs) if they could not identify who had possessed them.  Interview Tr., 6th Cir. R.19-2, at 8.  Robinson denied that he or his cousin owned the guns.  He instead claimed that a friend named "Mike" owned them. Robinson nevertheless admitted that he knew the guns were in the Elantra.  He also admitted that he had touched them and that they had been in his possession.  And he correctly identified their caliber.  Boggs, by comparison, knew nothing about them.  Robinson did not want her prosecuted and took responsibility for the presence of the guns in her car.

The federal government charged Robinson with possessing the firearms as a felon in violation of 18 U.S.C. § 922(g)(1).  Robinson stood trial.  A jury convicted him.  At sentencing, the district court calculated his guidelines range as 235 to 293 months' imprisonment.  Over Robinson's objection, the court also found that he qualified for a mandatory-minimum sentence of 180 months' imprisonment under the Armed Career Criminal Act.  The court varied downward from the guidelines range by imposing that minimum 15-year sentence.

II

Robinson raises three challenges to his conviction and one to his sentence. None has merit.

A. Ex Parte Jury Communication

Robinson first argues that the district court improperly answered a question from the jury without asking the parties for their input. At the outset, the parties dispute what the note said. The note in the record reads: "If we are unable to come to a unanimous decision tonight, what are the next steps?" Note, R.66, PageID 192. Yet Robinson argues that the note originally stated: "We are unable to come to a unanimous decision tonight. What are the next steps?" Tr., R.89, PageID 747. Robinson suggests that the "If" was added only later. His proof? When disclosing the note to the parties, the district court explained: "I received a note a little while ago that said—it's missing a word. It says, We are unable to come to a unanimous decision tonight. What are the next steps? It should be, If we are unable to come to a unanimous decision tonight, what are the next steps?" *Id.*

Either way, the court answered the note without consulting counsel. It responded: "You would return at 9:30 in the morning to continue deliberations." Note, R.66, PageID 192. The jury delivered its verdict "shortly after" the court gave its answer. Tr., R.89, PageID 747. The court alerted counsel about the note and its response before it brought the jurors into the courtroom to announce their verdict. Robinson did not object to the court's response at this point or in a post-trial motion. On appeal, however, he now argues that the court violated his Sixth Amendment right to counsel by answering the jury's question without involving his lawyer.

To resolve this claim, we begin with the proper standard of review. By raising the claim for the first time on appeal, Robinson seemingly forfeited it. *See United States v. Miller*, 734 F.3d 530, 536 (6th Cir. 2013). And his forfeiture would seemingly trigger the deferential plain-error test. *See United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (en banc). That test would require Robinson to show, among other things, that the district court committed an "obvious or clear" error by communicating with the jury on its own. *Id.* at 386 (citation omitted).

Robinson tries to avoid this deferential plain-error test by invoking Federal Rule of Criminal Procedure 51. Three parts of this rule matter here. First, the rule tells parties how to object: "A party may preserve a claim of error by informing the court—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). Second, it adds that parties need not assert "[e]xceptions to rulings or orders" to preserve the claimed error. Fed. R. Crim. P. 51(a). Third, it notes that "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." Fed. R. Crim. P. 51(b). Robinson relies on the last two parts of Rule 51. Citing Rule 51(b), he argues that he did not have the "opportunity" to object to the ex parte communication *beforehand*, so the failure to object at that time should not "prejudice" him. Citing Rule 51(a), Robinson argues that he did not have to make an *after-the-fact* "exception" to the communication. Under his view of Rule 51, then, parties need not do anything to preserve a claim of error about any district-court action if they did not have an opportunity to object beforehand—even if they had plenty of time afterward.

He misinterprets Rule 51. True, Rule 51(a) shows that a party need not make "formal 'exceptions' to a trial court's rulings" (that is, object using particular language). *Holguin-Hernandez v. United States*, 589 U.S. 169, 174 (2020). And true, Rule 51(b) makes clear that appellate courts should not punish litigants who lack the ability to object in the district court. *See Vonner*, 516 F.3d at 385. Yet Rule 51(b) also tells litigants that they should inform the court of their "objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b). So if a party did have the ability to raise a claim of error after a court takes an action, Rule 51 requires the party to raise the objection to the "action *that has already been taken*." 3B Charles Alan Wright & Peter J. Henning, *Federal Practice and Procedure* § 842 at 479, 479–81 (4th ed. 2013) (emphasis added). That is, although a party need not make a formal exception, the party must bring the claimed error "to the court's attention" in some way. *Holguin-Hernandez*, 589 U.S. at 174 (quoting Fed. R. Crim. P. 52(b)). Litigants cannot stay "silent" at the time that a district court could have fixed a problem and save the claimed error for later if the verdict does not turn out as they hoped. *See Puckett v. United States*, 556 U.S. 129, 134 (2009).

Our sentencing caselaw supports this reading of Rule 51. When a district court asks the parties if they have any objections after it imposes a sentence, a defendant must alert the court of any claim that the court did not adequately explain the sentence. *See Vonner*, 516 F.3d at 385–86. The defendant in that situation could not have objected before the court failed to explain its sentence because the alleged error "became apparent" only when the court finished imposing the sentence without an adequate explanation. *Id.* at 386. Nevertheless, we have held that the defendant must alert the court to the claimed error after the fact to preserve it. *See id.*

The same reasoning covers this case. In fact, one of our unpublished decisions has already held that plain-error review should apply to claims of ex parte communications between a court and the jury when the defendant failed to object after the court disclosed the communication. *See United States v. Paul*, 57 F. App'x 597, 604 (6th Cir. 2003) (per curiam). And many other courts have applied plain-error review to claims that a district court (or court staff) wrongly communicated with jurors outside the presence of the defendant or defense counsel. *See, e.g.*, *United States v. Rivera-Rodríguez*, 617 F.3d 581, 600–01 (1st Cir. 2010); *United States v. Wall*, 117 F. App'x 252, 254 (4th Cir. 2004) (per curiam); *United States v. Throckmorton*, 87 F.3d 1069, 1073 (9th Cir. 1996); *United States v. McDonald*, 933 F.2d 1519, 1524–25 (10th Cir. 1991); *United States v. Roberts*, 913 F.2d 211, 216 (5th Cir. 1990). We now formally join these courts.

If anything, the factual dispute in this case shows why courts should apply plain-error review in this scenario. Robinson's argument hinges on the claim that the jury was deadlocked, and he supports that conclusion with his view that the jury note read: "We are unable to come to a unanimous decision tonight. What are the next steps?" Tr., R.89, PageID 747. But the note in the record reads: "If we are unable to come to a unanimous decision tonight, what are the next steps?" Note, R.66, PageID 192. And we have no idea what the original note said. Was it missing a word? Then who added the "If"? Or did the court simply misread the note when it mentioned a missing word? Robinson's failure to object prevented the court from making an "appropriate record" about the facts. *Paul*, 57 F. App'x at 604. And we "are not equipped to decide factual questions in the first instance." *United States v. Ramamoorthy*, 949 F.3d 955, 963 (6th Cir. 2020). So we have sometimes refused to review a claim of error *at all* when a party's

failure to object has left "unresolved issues of fact." *Id.* at 964; *see United States v. Oldman*, 979 F.3d 1234, 1255 (10th Cir. 2020). At the least, Robinson's failure to object triggers plain-error review.

This standard dooms Robinson's claim because he has not shown an "obvious" Sixth Amendment violation. *Vonner*, 516 F.3d at 386 (citation omitted). The Sixth Amendment gives a defendant the right "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. If the government denies a defendant this right to counsel at any "critical stage" of the case, the Supreme Court has held that the defendant can obtain a new trial even without showing prejudice. *United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984). The phrase "critical stage" reaches any stage at which a "reasonable probability" exists that the defendant "could suffer significant consequences" from the denial of counsel. *Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012) (quoting *Van v. Jones*, 475 F.3d 292, 313 (6th Cir. 2007)).

We have held that a district court's response to a jury question can sometimes amount to such a "critical stage." *See Valentine v. United States*, 488 F.3d 325, 335 (6th Cir. 2007) (citing *Caver v. Straub*, 349 F.3d 340, 350 (6th Cir. 2003); *French v. Jones*, 332 F.3d 430, 436 (6th Cir. 2003)). We have added that a court can effectively "deny" a defendant the right to counsel at this stage—and thereby allow the defendant to establish a Sixth Amendment violation without the need to prove prejudice—if the court responds to the jury question without seeking counsel's input. *See French*, 332 F.3d at 436–39.

At the same time, this rule applies only to *certain* jury questions. We have held that a jury question involves a "critical stage" of the case if the question requires a district court either to instruct the jury "about the substantive elements of an offense" or to give "a deadlocked jury further instructions about how to proceed." *Valentine*, 488 F.3d at 335; *see Bourne*, 666 F.3d at 414. But we have further explained that a jury question does not involve a critical stage if it concerns more mundane matters. So a jury request to reexamine evidence did not trigger any right for counsel to help draft the response. *See Bourne*, 666 F.3d at 414; *see also United States v. Reynolds*, 489 F.2d 4, 8 (6th Cir. 1973). And a judge did not trigger a right to counsel by providing "scheduling information" to the jury. *Valentine*, 488 F.3d at 335.

Here, the district court would not have committed an "obvious" error by believing that it was providing similar "scheduling information."  *Vonner*, 516 F.3d at 386 (citation omitted); *Valentine*, 488 F.3d at 335.  When the jurors asked about the next steps if they did not reach a verdict that night, the court simply told them that they would return the next morning to continue deliberating.  The jury did not ask about "substantive elements" of Robinson's offenses. *Valentine*, 488 F.3d at 335.  And the district court reasonably interpreted the jury's note—with its limited "tonight" language—to be asking about scheduling rather than about how to proceed if they have reached an unfixable impasse.  Note, R.66, PageID 192.

In response, Robinson argues that the jury note showed that the jurors had deadlocked. *See Valentine*, 488 F.3d at 335.  And he finds it "debatable" how the court should have responded to this impasse.  Appellant's Br. 27.  Yet Robinson's claim rests on his version of the facts: that the jury note omitted the beginning "If."  His briefing does not assert that the note would have revealed a deadlocked jury if we instead interpret it to include that conjunction. Given Robinson's failure to create an "appropriate record" on this factual issue, *Paul*, 57 F. App'x at 604, we refuse to find a plain error based on his proposed version of debatable facts, *see Ramamoorthy*, 949 F.3d at 964; *see also United States v. Illies*, 805 F.3d 607, 609 (5th Cir. 2015); *United States v. Caldwell*, 518 F.3d 426, 431 (6th Cir. 2008).  Accepting the note at face value, the district court reasonably concluded that it had no duty to seek counsel's input into a mere scheduling matter.

## B.  "Bad Acts" Evidence

Robinson next contends that the TITANS detectives introduced two types of improper evidence at trial.  First, the prosecution asked several detectives to explain the role of the TITANS unit.  The detectives responded generally that the "unit investigates shootings" in Nashville neighborhoods.  Dumond Tr., R.88, PageID 495.  Second, Robinson's counsel asked a detective to concede that no eyewitnesses had seen Robinson with the guns.  But the detective answered: "I do have an eyewitness stating that they saw him with a handgun the day before, but that's on a different case."  Schroeder Tr., R.88, PageID 612.  Robinson argues that this testimony qualified as improper "bad acts" evidence because it implied that he had committed a shooting.  *See United States v. Blanton*, 520 F.2d 907, 909–10 (6th Cir. 1975).  And he argues

that the district court should have declared a mistrial under the factors that we use to measure the prejudice from improper testimony. *See United States v. Harvel*, 115 F.4th 714, 738–39 (6th Cir. 2024).

Our standard of review also dooms this evidentiary claim. Robinson concedes that he forfeited the claim and that we must review it for plain error. He did not object to the testimony describing the function of the TITANS unit. And while his counsel moved to strike the detective's comment that an eyewitness had seen him with a gun, Robinson did not seek a mistrial based on the comment. Indeed, the district court offered Robinson the option to take a mistrial based on the belated disclosure of evidence (allegedly including the detective's comment), but Robinson declined this offer. So the government says that we should not review this claim at all because Robinson intentionally waived it. *See United States v. Olano*, 507 U.S. 725, 733 (1993). But we need not resolve this standard-of-review debate because Robinson cannot show plain error.

To obtain a mistrial based on the improper admission of evidence, a defendant must first show that the admission of evidence was improper. *See United States v. Howard*, 621 F.3d 433, 458–59 (6th Cir. 2010). Robinson relies on Federal Rule of Evidence 404(b) to make this showing. That rule bars courts from admitting "[e]vidence of any other crime, wrong, or act" to prove a defendant's propensity to commit the charged crime. Fed. R. Evid. 404(b)(1); *see Harvel*, 115 F.4th at 731. Yet it allows courts to admit other-acts evidence for other reasons, such as to prove a defendant's intent. *See* Fed. R. Evid. 404(b)(2). Courts follow a "three-step" approach to assess the admissibility of this evidence. *United States v. Pritchard*, 964 F.3d 513, 523 (6th Cir. 2020). They first consider whether "sufficient evidence" exists that the defendant committed the prior act. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992) (en banc). They next consider whether the prosecution seeks to use the evidence for a proper purpose. *See id.* They lastly balance the unfair prejudice that the evidence might cause against its "probative" value. *Id.* at 1262.

When applying this framework here, the district court did not commit an "obvious" error by permitting either of the two types of challenged testimony. *United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) (citation omitted). To start, it is not obvious that Rule

404(b)'s ban on "bad acts" evidence even applies to the detectives' generic statements that the TITANS unit exists to investigate shootings. This testimony did not even mention Robinson— let alone disclose that he had committed a prior crime or bad act. *See United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999); *see also Howard*, 621 F.3d at 459.

The absence of any testimony that Robinson committed a prior bad act distinguishes his case from the one on which he relies. *See Blanton*, 520 F.2d at 909–10. In *Blanton*, we reversed a criminal conviction because an officer testified point-blank that the police were investigating the defendant for an unrelated bank robbery. *Id.* The district court could reasonably distinguish *Blanton*'s explicit other-crime evidence from this case's testimony, which merely identified the purpose of a police unit. The court thus did not commit plain error.

Next, the court also did not commit an obvious error by finding that defense counsel's cross-examination "opened the door" to the detective's comment that an eyewitness had seen Robinson with a gun. *United States v. Collins*, 434 F. App'x 434, 444 (6th Cir. 2011). Our precedent allows one party to admit evidence to respond to misleading impressions left by the other side. *See United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994). For example, even when a district court initially told the government not to discuss the punishment that a defendant's employer had imposed for his misconduct, the court properly allowed the government to admit this evidence after the defendant left the "misconception" that his employer had approved of his misconduct. *United States v. Buentello*, 423 F. App'x 528, 533 (6th Cir. 2011). And we have found no abuse of discretion when the district court declined to grant a mistrial because the challenged testimony was responsive to and elicited by defense counsel's own questions. *United States v. Abdullah*, 162 F.3d 897, 904 (6th Cir. 1998).

The district court reasonably concluded that this principle applied here. Before trial, the government agreed not to use any evidence about its "ongoing homicide investigation" into Robinson (which included an eyewitness who had seen him with a gun). Mot., R.44, PageID 99. But defense counsel implicated that investigation when counsel tried to get a detective to concede that he knew of no eyewitnesses who had seen Robinson handle the guns found in the car. At that point, the agreed-on evidentiary limitation would have left a "false impression" that nobody had ever seen Robinson possess a gun. *Segines*, 17 F.3d at 856 (citation omitted).

The district court thus allowed the detective to clarify that such an eyewitness did, in fact, exist. Because the court reasonably applied our "open the door" precedent, it did not commit a plain error.

## C. Jury Instruction

Robinson next challenges the jury instructions, arguing that they improperly described an element of the felon-in-possession statute. Under that statute, Robinson must have "possess[ed]" the firearms found in the Elantra. 18 U.S.C. § 922(g)(1). The parties proposed joint instructions that would have told the jury that "[t]he defendant does not need to own the firearms to possess them." Proposed Instrs., R.42, PageID 77. But the court rejected this instruction in favor of a more categorical rule: "Ownership is *irrelevant* to the issue of possession." Tr., R.89, PageID 731 (emphasis added). Robinson claims that this instruction misstated the law. And he says the error harmed him because he relied on evidence that someone else owned the guns found in the Elantra to bolster his defense that he did not possess them.

That said, Robinson again concedes that he failed to object to this instruction in the district court and thus that he must satisfy the plain-error test. In this instructional context, our plain-error test requires "a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Hofstetter*, 80 F.4th 725, 730 (6th Cir. 2023) (citation omitted). We appear to have established this test in 1983—a decade before the Supreme Court adopted its general four-part test for plain error in *Olano*. 507 U.S. at 732–36; *see United States v. Piccolo*, 723 F.2d 1234, 1241 (6th Cir. 1983). But our cases have continued to quote the same language from *Piccolo* after *Olano*. *See Hofstetter*, 80 F.4th at 730. In this case, we can assume that *Piccolo*'s language simply restates the general *Olano* requirements in a different way because the parties do not suggest any meaningful differences between the two tests. And a defendant cannot show an "obvious" error or "clearly erroneous" instruction unless the claimed mistake "is clear under current law." *Olano*, 507 U.S. at 734; *Piccolo*, 723 F.2d at 1241; *see United States v. Al-Maliki*, 787 F.3d 784, 794 (6th Cir. 2015).

This principle forecloses Robinson's claim.   The felon-in-possession statute requires a defendant to "possess" (not own) a weapon.   18 U.S.C. § 922(g)(1).   We have held that a defendant can violate this ban through either "actual" possession or "constructive" possession. *United States v. Brooks*, 987 F.3d 593, 601 (6th Cir. 2021) (citation omitted).   A defendant actually possesses a gun if the defendant exercises "actual and physical control" over it.   *Id.* (citation omitted).   A defendant constructively possesses a gun if the defendant "*knowingly* has the power and *intention* at a given time to exercise dominion or control" over the gun, "either directly or through others."   *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (citation omitted).

Our "current law" does not unambiguously articulate the evidentiary value (if any) of a defendant's gun *ownership* (or lack of ownership) on the ultimate question whether the defendant actually or constructively *possessed* the gun.   *Olano*, 507 U.S. at 734.   On the one hand, many of our cases seemingly support the district court's jury instruction.   They suggest that a defendant's ownership of a gun is "irrelevant" to whether the defendant possessed the gun. *United States v. Saikaly*, 207 F.3d 363, 368 (6th Cir. 2000); *see United States v. Bell*, 434 F. App'x 515, 519 (6th Cir. 2011); *United States v. Hadley*, 431 F.3d 484, 508 (6th Cir. 2005); *United States v. Solorio*, 337 F.3d 580, 600 (6th Cir. 2003); *United States v. Hardin*, 248 F.3d 489, 498 (6th Cir. 2001).

On the other hand, these cases have not considered whether ownership is "relevant" to possession within the meaning of the relevance definition in the Federal Rules of Evidence. Rather, they have asked only whether sufficient evidence existed on appeal to support a finding that the defendant possessed a gun.   *See, e.g.*, *Saikaly*, 207 F.3d at 368.   In that context, we have rightly rejected claims that a defendant's lack of ownership also proved that the defendant did not possess the gun.   In other words, one could read the relevancy language in our cases as a shorthand way of expressing the rule that possession does not "*require*" ownership.   *United States v. Workman*, 755 F. App'x 533, 537 (6th Cir. 2018) (emphasis added).

If we read this language more broadly, it might conflict with the evidence rules.   Those rules set a "low bar" for relevancy.   *United States v. Potter*, 927 F.3d 446, 452 (6th Cir. 2019). They ask only whether evidence about the defendant's gun ownership "has any tendency to

make" the defendant's possession "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). And one might think that a defendant's ownership of a gun tends to make it more likely that the defendant constructively possessed the gun. *Cf. United States v. Gonzalez*, 71 F.3d 819, 834 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009). Indeed, we have at times equated constructive possession with ownership. *See United States v. Synder*, 913 F.2d 300, 304 (6th Cir. 1990). And if that inference is accurate, one might also think conversely that a defendant's lack of ownership tends to make it less likely the defendant constructively possessed the gun. Perhaps for these reasons, our pattern jury instructions recommend that district courts inform juries that a "defendant does not have to own the firearm in order to possess the firearm"; the instructions do not say that ownership is altogether irrelevant to possession. Sixth Circuit Pattern Criminal Jury Instruction 12.01(2)(A) (Jan. 1, 2024).

At day's end, though, we need not resolve this question. Because we have suggested in dicta that ownership is irrelevant to possession, the district court's instruction did not run afoul of our "current law." *Olano*, 507 U.S. at 734. The court thus did not commit a plain error. *Id.*

### D. Sentencing Challenge

Lastly, Robinson objects to his sentence. The Armed Career Criminal Act requires courts to impose a 15-year mandatory minimum if a defendant has "three previous convictions" for a "violent felony" or "serious drug offense" and the defendant committed the three crimes "on occasions different from one another[.]" 18 U.S.C. § 924(e)(1). Robinson's presentence report suggested that this enhancement applied because of three prior convictions: (1) a conviction for a murder in 1991; (2) a conviction for his possession with the intent to sell hydrocodone in 2013; and (3) a conviction for his possession with the intent to sell heroin in 2017. PSR, R.81, PageID 286, 289, 294, 296–97. Robinson objected to the enhancement on the ground that the jury must decide whether he committed these three crimes on different "occasions" within the meaning of the statute. The district court disagreed because our then-binding precedent assigned this different-occasions question to the court. *See United States v. Williams*, 39 F.4th 342, 351 (6th Cir. 2022). And the court found that the question was not a "close" one. Sent. Tr., R.90, PageID 755. Robinson had committed his murder some 22 years before he possessed with intent to sell

hydrocodone, and he had committed the hydrocodone offense about four years before he possessed heroin with the intent to sell it.

Robinson appealed the district court's conclusion that courts rather than juries should resolve the different-occasions question.  During the briefing on this question, the Supreme Court issued an opinion agreeing with Robinson's constitutional claim.  *See Erlinger v. United States*, 602 U.S. 821, 834–35 (2024).  In *Erlinger*, the Court held that the Fifth and Sixth Amendments require a jury to find beyond a reasonable doubt that a defendant committed the three offenses on different occasions.  *Id.*  Given *Erlinger*, the government and Robinson both agree that the district court wrongly refused to submit the different-occasions question to the jury.

This appeal now concerns only whether we may find that constitutional error harmless. We have issued two decisions that affect this harmless-error question.  *See United States v. Cogdill*, 130 F.4th 523, 527–31 (6th Cir. 2025); *United States v. Campbell*, 122 F.4th 624, 630–33 (6th Cir. 2024).  To begin with, we have concluded as a general matter that courts may find *Erlinger* errors harmless.  *See Campbell*, 122 F.4th at 630–33.  The Supreme Court has long held that a court may treat the failure to submit an element of a crime to the jury as harmless if the court can conclude "beyond a reasonable doubt" that the jury would have still convicted the defendant even without this erroneous omission.  *Neder v. United States*, 527 U.S. 1, 17 (1999). And the Supreme Court has also held that this harmless-error rule applies even when the identified element was disguised as a sentencing enhancement.  *See Washington v. Recuenco*, 548 U.S. 212, 218–22 (2006).  In *Campbell*, we extended this Supreme Court precedent to the factual finding required to trigger the Armed Career Criminal Act: that the defendant committed the three crimes on different occasions.  *See* 122 F.4th at 630–31.

Next, our cases have made clear that this harmless-error question depends on "all 'relevant and reliable information' in the 'entire record,'" including facts listed in a defendant's presentence report.  *Id.* at 633 (quoting *Greer v. United States*, 593 U.S. 503, 510–11 (2021)). Applying that test, *Campbell* found an *Erlinger* error harmless beyond a reasonable doubt when the record revealed that the defendant had committed an armed robbery in August 1985, a drug offense in August 1992, a second drug offense in December 1992, and a third drug offense in

March 1993. *Id.* at 627, 632–33. The defendant agreed that the robbery occurred at a different time. *See id.* at 628. And we held that any reasonable jury would have found that at least two of the drug offenses also occurred on different occasions because of the months-long gaps between them, because they took place in different cities, and because they involved different drugs. *Id.* at 632.

Conversely, we refused to find an *Erlinger* error harmless in *Cogdill*. *See* 130 F.4th at 527–31. There, the defendant had manufactured methamphetamine in December 2003, sold methamphetamine in June 2014, and possessed methamphetamine with the intent to sell it in September 2014. *See id.* at 526. The defendant agreed that his manufacturing offense occurred on a different occasion. *See id.* at 529. But we held that a reasonable jury could find the two later trafficking offenses did not. *See id.* at 529–30. We reasoned that both offenses involved trafficking in the same drug in the same county within a few months of each other. *See id.*

This case looks more like *Campbell* than *Cogdill*. If anything, the facts here make it easier for us to find the *Erlinger* error harmless than the facts in *Campbell*. Consider Robinson's three prior crimes: He murdered a victim in 1991 and served close to two decades in prison before he committed his two drug offenses. PSR, R.81, PageID 289. The police then found Robinson near a school with "hydrocodone tablets" on October 7, 2013, and he pleaded guilty to possessing the tablets with the intent to sell them in September 2014. *Id.*, PageID 294. A state court imposed a 12-year sentence, but it suspended this sentence in favor of "community corrections." *Id.* After violating his community corrections several times, Robinson was found with "two bags of heroin" on July 20, 2017. *Id.*, PageID 295, 297. He pleaded guilty to possessing with the intent to sell heroin in January 2018, and the court sentenced him to a prison term for this distinct offense. *Id.*, PageID 296. The latter two drug offenses thus involved different drugs and took place years apart. A court had also punished and sentenced Robinson for one of the drug offenses before he committed the other one. Given these undisputed facts, Robinson does not even try to argue that this error was harmful under the standards that we applied in *Campbell* and *Cogdill*.

Robinson instead makes two arguments in favor of different standards. *First*, he interprets the Armed Career Criminal Act's text not to permit jury trials for this different-

occasions question, and he argues that courts may not rewrite the Act to fix this problem under basic severance principles. In essence, then, he says that courts may not treat the Act's enhancement as mandatory until Congress amends the law to authorize jury trials for the different-occasions element. *Cf. United States v. Booker*, 543 U.S. 220, 249–58 (2005). Yet Robinson identifies nothing in the text of § 924(e) that compels the court—rather than the jury—to make the required finding. And if any ambiguous provision arguably could be read to compel the court to make the finding, constitutional-avoidance principles would tell us to read the provision in a way that eliminated the constitutional problem. *See United States v. Fields*, 53 F.4th 1027, 1038–42 (6th Cir. 2022).

*Second*, Robinson argues that we must treat this error as harmful simply because it increased his statutory maximum from 10 years to 15 years. *Compare* 18 U.S.C. § 924(a)(2) (2018), *with id.* § 924(e)(1). To support this claim, Robinson relies on only one case: *United States v. Page*, 232 F.3d 536 (6th Cir. 2000). There, the district court had sentenced one defendant (Harvey Page) to 30 years' imprisonment based on a factual finding that his drug offense involved a certain quantity of drugs. *See id.* at 539. We held that the jury should have made this drug-quantity finding because it increased Page's statutory maximum. *See id.* at 543. We added on plain-error review that this error had harmed Page because it substantially increased his sentence. *Id.* at 545. Robinson interprets *Page* as foreclosing the type of harmless-error inquiry that we have undertaken in his case because the *Page* court did not ask whether the evidence would have allowed the jury to find a different drug quantity. But he overreads this decision. The government did not even argue that the evidence would have required a reasonable jury to find the district court's chosen drug quantity, so *Page* had no opportunity to consider this question. Since *Page*, moreover, we have held that the harmless-error inquiry in that context asks whether the evidence would have required a reasonable jury to find the relevant drug quantity beyond a reasonable doubt. *See United States v. Stewart*, 306 F.3d 295, 318–25 (6th Cir. 2002). And *Campbell* has since extended a similar test to this *Erlinger* context. *See* 122 F.4th at 630–31. We must follow that binding precedent here. *See Cogdill*, 130 F.4th at 527.

We affirm.